335 Conn. 745    DECEMBER, 2020    745

In re Teagan K.-O.

# IN RE TEAGAN K.-O.*
## (SC 20245)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.**

*Syllabus*

The respondent father appealed from the trial court's denial of his motion
to dismiss the petition filed by the petitioner, the Commissioner of
Children and Families, to adjudicate T, the child of the respondent
parents, neglected. T was born in Florida, and, after the Florida Depart-
ment of Children and Families took emergency custody of T and con-
tacted the Connecticut Department of Children and Families to report
that the respondent mother had given birth to T, the petitioner filed the
neglect petition at issue. Shortly thereafter, the Florida Department of
Children and Families filed in a Florida court a motion to transfer
jurisdiction to the Connecticut court on the basis of the family's history
with service providers and child protective services in Connecticut. A
Florida magistrate issued a report and a recommendation to grant the
motion. The magistrate concluded that Connecticut was a more conve-
nient forum, in part because the petitioner wanted to add T to a pending
dependency case in Connecticut filed in connection with a petition for
termination of the respondents' parental rights with respect to T's older
sibling. The Florida court ratified and adopted the magistrate's recom-
mendation to transfer jurisdiction to the Connecticut court. Subse-
quently, the father filed a motion to dismiss the pending neglect petition
filed in Connecticut on the ground of lack of subject matter jurisdiction.
The trial court denied that motion, and the father appealed, claiming,
inter alia, that, regardless of whether a petition to terminate the respon-
dents' parental rights with respect to another child of the respondents
was pending in Connecticut when they relocated to Florida, a Connecti-
cut court could not exercise subject matter jurisdiction over T's neglect
petition because any neglect of her would not occur in Connecticut.
The petitioner claimed, inter alia, that the determination by a Florida
court that Connecticut would be a more appropriate forum provided a
proper basis for the Connecticut trial court's subject matter jurisdiction
under the Uniform Child Custody Jurisdiction and Enforcement Act
(UCCJEA), which has been adopted by both Connecticut and Florida.
*Held*:

---

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the Supreme Court.

** The listing of justices reflects their seniority status on this court as of
the date of oral argument.

In re Teagan K.-O.

1. The trial court's denial of the father's motion to dismiss the neglect
   petition was immediately appealable because, although that decision
   was an interlocutory ruling, it constituted an appealable final judgment
   under the second prong of the test for determining the appealability of
   interlocutory orders set forth in *State* v. *Curcio* (191 Conn. 27), as there
   was a colorable claim that delaying a determination with respect to the
   issue of jurisdiction would cause irreparable harm to the parent-child
   relationship and the best interest of the child; the Connecticut court's
   exercise of jurisdiction necessarily would have some adverse impact
   on the nature and extent of visitation and, in turn, the father's ability
   to bond with T, and, if an appeal after an adverse decision on the merits
   resulted in a determination that the Connecticut court lacked subject
   matter jurisdiction over the neglect petition, the issue of neglect undoubt-
   edly would have been relitigated in Florida, and such a delayed resolution
   of that issue would have impacted T's interests in permanency and sta-
   bility.

2. The trial court improperly denied the father's motion to dismiss the neglect
   petition because the failure to satisfy the statute (§ 46b-121 (a) (1))
   imposing a territorial limitation on jurisdiction over proceedings con-
   cerning allegedly neglected children prevented a Connecticut court from
   exercising jurisdiction over the petition, irrespective of whether the
   conditions for exercising jurisdiction under the UCCJEA were satisfied,
   as there were no allegations from which this court reasonably could
   infer that T likely would be neglected in this state: courts from other
   states that have considered whether a territorial limitation dictated by
   statute or common law must be satisfied even though the matter was
   a child custody proceeding subject to the UCCJEA or its predecessor
   have all indicated that the respective state's territorial limitation must
   be satisfied; moreover, the purpose of the UCCJEA, which is to deter-
   mine which state having jurisdiction will be permitted to exercise it
   when two or more states have concurrent jurisdiction, indicates that
   the UCCJEA does not permit the exercise of jurisdiction when the
   jurisdictional requirements of a statute specific to the matter at hand
   are not met, and, because the UCCJEA does not confer subject matter
   jurisdiction but, instead, determines whether a court may exercise juris-
   diction or must defer to another state's jurisdiction, it provided no
   impediment to statutes, such as § 46b-121, that determine the scope of
   jurisdiction; furthermore, contrary to the petitioner's claim, giving effect
   to the territorial limitation set forth in § 46b-121 will not impede the
   operation of the UCCJEA by creating a possible scenario under which
   Florida lacks home state or significant connection jurisdiction, and
   Connecticut has significant connection jurisdiction under the UCCJEA
   but is prevented from exercising its jurisdiction because of the territorial
   limitation applicable to neglect proceedings, as Connecticut would not
   have significant connection jurisdiction if the territorial limitations under
   § 46b-121 were not met, and, even if Connecticut would have significant
   connection jurisdiction under the facts of the present case, Florida would

335 Conn. 745 DECEMBER, 2020 747

In re Teagan K.-O.

be permitted to exercise jurisdiction under the UCCJEA's temporary emergency jurisdiction provision.

(*Three justices concurring in part and dissenting in part in one opinion*)

Argued March 27, 2019—officially released June 24, 2020***

*Procedural History*

Petition by the Commissioner of Children and Families to adjudicate the respondents' minor child neglected, brought to the Superior Court in the judicial district of New London, Juvenile Matters at Waterford, where the court, *Hon. Michael A. Mack*, judge trial referee, denied the respondent father's motion to dismiss, and the respondent father appealed. *Reversed*; *decision directed.*

*Joshua Michtom*, assistant public defender, with whom was *Don M. Hodgdon*, for the appellant (respondent father).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare Kindall*, solicitor general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

McDONALD, J. This case requires us to consider whether a Connecticut trial court has subject matter jurisdiction over a petition to adjudicate a newborn child neglected on the basis of "predictive neglect"[1] when

***June 24, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] "The doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred." (Internal quotation marks omitted.) *In re Joseph W.*, 305 Conn. 633, 644, 46 A.3d 59 (2012). To establish predictive neglect, "the trial court must find that it is more likely than not that, if the child remained in the current situation, the child would be 'denied proper care and attention, physically, educationally, emotionally or morally'; General Statutes (Rev. to 2011) § 46b-120 (8) (B); or would be 'permitted to live under conditions, circumstances or associations injurious to the well-being of the child . . . .' General Statutes (Rev. to 2011) § 46b-120 (8) (C) . . . ." (Citation omitted.) *In re Joseph W.*, supra, 646. "If the parents have indicated that they intend to care for the child jointly . . . the trial court may treat the parents as a

In re Teagan K.-O.

the parents relocated to another state shortly before the child's birth, purportedly with no intention of returning, and that state determined that Connecticut would be a more convenient forum to adjudicate this matter. The respondent father appeals from the trial court's decision denying his motion to dismiss the petition filed by the petitioner, the Commissioner of Children and Families, to adjudicate the respondents' child, Teagan K.-O., neglected. The father contends that, irrespective of the fact that a petition to terminate the respondents' parental rights with respect to another child of theirs was pending in Connecticut when they relocated to Florida, a Connecticut trial court cannot exercise subject matter jurisdiction over Teagan's neglect petition because any neglect of her would never occur in this state. The commissioner contends that the determination by a Florida court that this state would be a more appropriate forum provided a proper basis for the Connecticut trial court's subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), which has been adopted by both states.[2] See General Statutes §§ 46b-115 through 46b-115gg; Fla. Stat. Ann. § 61.501 et seq. (West 2012). We agree with the father's jurisdictional argument. The trial court, therefore, improperly denied his motion to dismiss the neglect petition.

The record reveals the following facts that are undisputed for the purposes of the present appeal.[3] The

single unit in determining whether the petitioner has met [his or her] burden of proving predictive neglect." Id., 647–48.

[2] For convenience, in this opinion we cite Connecticut's version of the UCCJEA and denote those few provisions in which Florida's version has any material difference.

[3] The record before this court does not include many of the filings from the Florida proceedings. The facts on which we rely are those found by the trial court in either Florida or Connecticut, or those alleged in pleadings filed by the Florida Department of Children and Families or the Connecticut commissioner, which have not been challenged by the respondents.

In re Teagan K.-O.

respondents, both raised in Connecticut, have a lengthy history of involvement with the Connecticut Department of Children and Families. Each had been placed in the department's custody as a teenager due to various mental health issues. The respondents' involvement with the department continued after they had children.

The respondent mother's first child, A, born in Connecticut in 2012, was conceived with someone other than the respondent father. In 2013, the department became involved with A due to concerns about the mother's mental health, her parenting ability, and domestic violence, as well as concerns about possible physical abuse of A. A was adjudicated neglected, and, thereafter, sole custody was awarded to A's father.

The respondents subsequently had three children together; the first two children were born in Connecticut. Their first child, G, was removed from the respondents' custody within one month of his birth in 2015, in light of the mother's history and an incident of domestic violence in G's presence. Subsequently, G was adjudicated neglected and placed in the commissioner's custody. The respondents' second child, J, was removed from the respondents' custody immediately after his birth in 2016, on the ground that the respondents had not addressed mental health and parenting issues. In March, 2017, J was adjudicated neglected and committed to the commissioner's custody. At that same time, the respondents' parental rights with respect to G were terminated.

In April, 2018, the commissioner filed a petition seeking to terminate the respondents' parental rights with respect to J. The mother was then near full-term in her pregnancy with Teagan. The respondents paid a relative to drive them to Gainesville, Florida, where they signed a one year lease for an apartment.

In May, 2018, Teagan was born in a Gainesville hospital. The hospital contacted the Florida Department of Children and Families after information came to light that the respondents' other children had been removed from their care. Two days after Teagan's birth, when she was ready to be discharged from the hospital, the Florida department took emergency custody of her.[4] The Florida department contacted the Connecticut department to report that the mother had given birth.

One day after the Florida department took emergency custody of Teagan, the commissioner filed a motion in the Connecticut Superior Court for Juvenile Matters at Waterford (trial court) seeking temporary custody of Teagan and a petition seeking to adjudicate Teagan neglected on the ground that she would be subject to conditions injurious to her well-being if she remained in the respondents' care or that she was denied proper care and attention.[5] The motion for temporary custody

[4] According to its brief filed in the First District Court of Appeal for Florida, the Florida department took this action after learning of the respondents' past history, that they had left Connecticut to avoid the Connecticut department's involvement with Teagan, and that they had offered to pay a relative to transport them out of Florida when they realized that the Florida department was going to be involved with Teagan. It is unclear from the record whether it was the Florida department or the Connecticut department that first initiated communication with its counterpart. Nor is it clear whether conduct by the mother prompted an investigation, which, in turn, led the two agencies to communicate.

[5] Because the merits of the pending neglect petition for Teagan are not an issue before us, we do not recount in detail the commissioner's allegations. To convey the gravity of the concerns that led to the filing of the present petition, it suffices to note that, in addition to allegations about the long-standing mental health issues of the respondents, particularly the mother, that raised concerns about violence in the home and their parenting abilities, the commissioner alleged in Teagan's neglect petition that the mother had suffered from postpartum depression following the birth of her two older children, A and G. This condition caused the mother to have thoughts of harming herself and her child, and she admitted to trying to smother A and to having thoughts of throwing G in the fireplace. We underscore that our conclusion as to jurisdiction is not intended to call into question the propriety of the Connecticut department's efforts to convey the gravity of these concerns to the Florida department.

In re Teagan K.-O.

was denied on the ground that the child was not in Connecticut.

Shortly thereafter, the Florida department filed in the Circuit Court of the Eighth Judicial Circuit of Florida, Juvenile Division (Florida court), a ''motion to transfer jurisdiction'' to the Connecticut trial court on the basis of the family's history with service providers and child protective services in this state. The respondents opposed the motion. A Florida general magistrate held a contested hearing on the motion, at which the respondents were represented by separate counsel. Following the hearing, the magistrate issued a report and a recommendation to grant the motion.

The recommendation rested on the following factual findings. An open dependency case in Connecticut was then pending on a petition for termination of the respondents' parental rights with respect to Teagan's sibling, J. The commissioner wanted to add Teagan to the open dependency case. The respondents had admitted to the Florida department that they traveled to Florida before Teagan's birth to avoid further involvement with the Connecticut department. Witnesses and persons with knowledge of the issues pertaining to Teagan's possible neglect and to the possible termination of the respondents' parental rights as to J reside in Connecticut. The respondents previously had been involved with the Connecticut department as children, and their parental rights with respect to another child had been terminated. Teagan's guardian ad litem and the Connecticut department both supported the transfer of jurisdiction. The Florida court had verified with the Connecticut trial court, *Driscoll, J.*, that the Connecticut court wanted to, and would, accept jurisdiction.[6]

_____
[6] At the hearing on the motion, the magistrate stated: ''[A]fter I received the motion [to transfer jurisdiction], I did make contact with Judge Driscoll of the [Connecticut trial court]. I did not talk to Judge Driscoll directly. We exchanged messages, and the message I received in return was that his court would accept and wanted transfer of jurisdiction, and that there are

In re Teagan K.-O.

The magistrate acknowledged that the respondents opposed the transfer of jurisdiction and that, in support of their opposition, they had presented a copy of their Florida lease and represented that the father was employed in Gainesville.[7] The magistrate also acknowledged that the respondents had offered to consent to Teagan's dependency if the Florida court retained jurisdiction, to eliminate the need for witnesses and to allow the court to rely solely on documentation from the Connecticut department to establish a reunification plan. The magistrate noted, however, that the Florida department and Teagan's guardian ad litem represented that they had no intention of offering or supporting reunification should the Florida court retain jurisdiction and, instead, would seek to terminate the respondents' parental rights with respect to Teagan on the basis of the respondents' prior history.

The magistrate's report concluded: "Connecticut is a more convenient forum state, and the court finds that it is in the best interests of the child . . . and will promote the efficient administration of justice to transfer jurisdiction to Connecticut." The following day, after the parties waived the period for filing exceptions to the magistrate's report, the Florida court ratified and adopted the magistrate's recommendation to transfer jurisdiction to the Connecticut court.

The commissioner then renewed her request for an ex parte order for temporary custody of Teagan in the trial court, which the court, *Driscoll, J.*, granted. Teagan was brought to Connecticut and placed with the same foster family caring for her sibling, J.

court dates coming up within the next few weeks in the case in Connecticut, and this case would be added if transferred. And Children's Legal Services conferred with their counterparts in Connecticut, according to the motion, and they are willing and, in fact, wanting to accept Teagan into their case."

[7] At the hearing before the magistrate, the father's counsel represented that the father had begun full-time employment at a Hampton Inn in Florida one week before the hearing. The mother's counsel also represented that the mother recently had begun counseling sessions and identified the provider.

In re Teagan K.-O.

The father filed a motion to dismiss the pending neglect petition on the ground of lack of subject matter jurisdiction.[8] Appended to the motion were copies of the respondents' Florida lease, a pay stub from the father's Florida employment, and the father's Florida voter registration card, which was issued after the Florida court proceeding. The commissioner opposed the motion, contending that the Florida court's inconvenient forum determination established a basis for the Connecticut trial court's subject matter jurisdiction under the UCCJEA. After a contested hearing on the motion, the trial court, *Hon. Michael A. Mack*, judge trial referee, opened the evidence twice—once to take evidence that the father had appealed from the Florida court's decision granting the motion to transfer, and again to take evidence that the First District Court of Appeal of Florida had issued a per curiam, summary affirmance.

The Connecticut trial court denied the father's motion to dismiss. The court cited two reasons. First, the trial court reasoned that a Florida District Court of Appeal had affirmed that jurisdiction rests with Connecticut courts, after the respondents had had an opportunity to present evidence in that forum on the matter and had failed to present such evidence. Second, the trial court determined that the respondents could not seek equitable redress because they did not come to the court with clean hands, given their admission to the Florida department that they had traveled to Florida to avoid involvement with the Connecticut department.[9]

_____

[8] The father also sought dismissal on the ground of a lack of personal jurisdiction, a claim that the court summarily disposed of as follows: "[The father's] contention that he was not served 'in Connecticut' and therefore [that] the proceedings are invalid misstates the law of Connecticut, the law of Florida, and the [UCCJEA]." The father does not renew his personal jurisdiction claim on appeal.

[9] In her brief to this court, the commissioner concedes that unclean hands would not have been a proper basis to deny the father's motion to dismiss because he was not seeking equitable relief but argues that the court's decision did not rest on this basis. We need not reach this issue in light of our conclusion that dismissal was compelled for other reasons.

Ultimately, the trial court concluded that "it has subject matter jurisdiction over Teagan's case following the dictates of the [UCCJEA] in that a court of Florida has declined to exercise jurisdiction on the ground that Connecticut is the more appropriate forum, [a Florida District Court of Appeal] has affirmed that, and Connecticut has accepted that conclusion."

The father appealed from the trial court's decision denying his motion to dismiss to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. After the father filed his brief with this court, but before the commissioner filed her appellate brief, the commissioner filed a petition in the trial court seeking to terminate the respondents' parental rights with respect to Teagan.

I

Before we can consider whether the trial court properly denied the motion to dismiss, we must determine whether that decision is immediately appealable. Ordinarily, a denial of a motion to dismiss on jurisdictional grounds is an interlocutory ruling, not a final judgment; see, e.g., *Chrysler Credit Corp.* v. *Fairfield Chrysler-Plymouth, Inc.*, 180 Conn. 223, 227–28, 429 A.2d 478 (1980); see also *Dayner* v. *Archdiocese of Hartford*, 301 Conn. 759, 768, 23 A.3d 1192 (2011); which is a statutory prerequisite to appellate jurisdiction in most instances. See, e.g., *State* v. *Anderson*, 318 Conn. 680, 698 n.6, 122 A.3d 254 (2015). To surmount that obstacle, the trial court's decision in the present case must fall within one of two circumstances in which an interlocutory order has the *attributes* of a final judgment so as to permit immediate appeal, either "(1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them." *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). The parties contend that the present circum-

In re Teagan K.-O.

stances satisfy the second prong of *Curcio*, although they disagree on the underlying rationale. We agree with one of the arguments advanced by the father as to why the trial court's ruling is immediately appealable.[10]

"The second prong of the *Curcio* test focuses on the nature of the right involved. It requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right already secured to them and that that right will be irretrievably lost and the [parties] irreparably harmed unless they may immediately appeal. . . . One must make at least a colorable claim that some recognized statutory or constitutional right is at risk." (Internal quotation marks omitted.) *Dayner* v. *Archdiocese of Hartford*, supra, 301 Conn. 769.

A constellation of constitutional and statutory rights serve to protect the integrity of the family unit, the parent-child relationship, and the best interest of the child. See General Statutes § 46b-135; *In re Jonathan M.*, 255 Conn. 208, 231, 764 A.2d 739 (2001); *State* v. *Anonymous*, 179 Conn. 155, 162–63, 425 A.2d 939 (1979). "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the [s]tate." (Internal quotation marks omitted.) *In re Valerie D.*, 223 Conn. 492, 513, 613 A.2d 748 (1992).

---

[10] The father contends that the decision denying his motion to dismiss is immediately appealable because litigating custody in a distant jurisdiction will impair his ability to participate in the litigation, to call witnesses in his defense, to engage in services to facilitate reunification, and to visit with Teagan. The commissioner contends that no evidence was presented to support these claims of irreparable harm and that the mere fact that a parent must litigate a case in another state does not necessarily mean the parent has been irreparably harmed. The commissioner nonetheless agrees that the father can immediately appeal because doing so would be the only way in which he could potentially be afforded the relief he was originally seeking—avoiding litigation in Connecticut. In light of our agreement with one of the father's arguments, we need not consider the other arguments.

In re Teagan K.-O.

"[C]ourts and state agencies must keep in mind the constitutional limitations imposed [on them when they undertake] any form of coercive intervention in family affairs . . . [which includes] the right of the family to remain together without the . . . interference of the awesome power of the state." (Internal quotation marks omitted.) *In re Shamika F.*, 256 Conn. 383, 403, 773 A.2d 347 (2001).

There is a "unique place that family courts hold in this state's jurisprudence.[11] This court has a long history of concluding that, within the context of family matters, orders that would otherwise be considered interlocutory constitute appealable final judgments. . . . Taken as a whole, these cases demonstrate that, [o]n balance, we [have been] more persuaded by the rationale for allowing an immediate appeal of . . . temporary . . . order[s] [in family matters] than by the traditional reasons of judicial economy that might otherwise have precluded [their] review." (Citations omitted; footnote added; internal quotation marks omitted.) *Khan* v. *Hillyer*, 306 Conn. 205, 213–14, 49 A.3d 996 (2012). We have reached this result because even temporary disruptions to the parent-child relationship can result in irreparable harm. When children have been temporarily removed from their parents' care, we have determined that "an immediate appeal is the only reasonable method of ensuring that the important rights surrounding the parent-child relationship are adequately protected . . . and . . . is the only way to ensure the protection of the best interests of children." (Citation omitted; internal quotation marks omitted.) *In re Shamika F.*, supra, 256 Conn. 385; see also *Madigan* v. *Madigan*, 224 Conn.

---

[11] The same policy concerns that inform our approach to interlocutory appeals from trial court decisions in family matters are implicated in such appeals from trial court decisions in juvenile matters. See generally General Statutes § 46b-1 (defining Superior Court's jurisdiction over family relations matters to include juvenile matters).

In re Teagan K.-O.

749, 754–55, 620 A.2d 1276 (1993). This concern may also extend to orders potentially affecting visitation.[12] See *Taff* v. *Bettcher*, 243 Conn. 380, 386–87, 703 A.2d 759 (1997) (recognizing that court order imposing one year bar on review of custody and visitation orders may interfere with parent's custodial rights in manner that cannot be redressed later and cause harm to child, as "[a] lost opportunity to spend significant time with one's child is not recoverable").

There is a colorable claim in the present case that delaying a determination on the question of jurisdiction would cause irreparable harm to the parent-child relationship and the best interest of the child. The trial court's exercise of jurisdiction necessarily would have some adverse impact on the nature and extent of visitation and, in turn, the father's ability to bond with his infant daughter.[13] Even if we assume that the Connecticut department would be willing to pay for the father's travel, the combination of distance and employment obligations undoubtedly limit in person visitation opportunities. Although the commissioner's petition for termination of parental

---

[12] The trial court deferred ruling on the father's motion for visitation until the jurisdictional issue was resolved but noted that visitation could be worked out with the Connecticut department on a voluntary basis in the interim. The petition to terminate the respondents' parental rights filed in January, 2019, after the ruling on the motion to dismiss was issued, states that, since Teagan was brought to Connecticut, the father has not had a supervised visit with her "due to [his] residing in Florida." The petition does not indicate whether the department ever offered to provide supervised visitation at its expense. It does indicate that the father had failed to engage in any contact with the department since September, 2018, approximately one month before his motion to dismiss was denied.

[13] Although nothing in the record before this court indicates whether the respondents made an argument to the Florida court that transfer would adversely impact visitation, we do not view that omission to preclude the father from raising that concern in connection with his final judgment argument in this court. Insofar as the commissioner contends, in connection with the final judgment issue, that the father presented no evidence regarding the impact of the trial court's jurisdiction on visitation, we are hard-pressed to see how or when he could have presented such evidence.

rights indicates that the family caring for Teagan has facilitated remote audiovisual interactions, i.e., Face-Time, between the father and Teagan, such interactions are a poor substitute for a parent's embrace.

In addition to the impact on visitation, a broader concern is implicated under the particular facts of this case. This court has recognized the importance of a child's interest in permanency and stability. See *In re Davonta V.*, 285 Conn. 483, 494–95, 940 A.2d 733 (2008). A delayed implementation of a permanency plan, whether aimed at reunification or termination, is of particular concern under the present circumstances. Unlike the typical challenge to subject matter jurisdiction, if an appeal after an adverse decision on the merits results in a determination that the court lacked subject matter jurisdiction over the neglect petition, the issue of neglect no doubt would be relitigated in Florida. The commissioner agrees that the possibility of such a delayed resolution clearly would be detrimental to Teagan.[14] Under these

---

[14] It appears that, under various rules that govern interlocutory appeals in other jurisdictions, most jurisdictions permit an immediate appeal from a decision determining that subject matter jurisdiction exists under the UCCJEA. See *In re Marriage of Lamaria*, Docket No. B237111, 2013 WL 1402278, *3 (Cal. App. April 8, 2013) (rejecting claim that jurisdictional determination under UCCJEA is not appealable interlocutory order); *Cohen* v. *Cohen*, 300 Ga. App. 7, 8, 684 S.E.2d 94 (2009) (denial of motion to dismiss for lack of jurisdiction under UCCJEA was immediately appealable because decision involves child custody order, which is immediately appealable by statute); *In re Welfare of Child of G.R.*, Docket No. A17-0995, 2017 WL 5661606, *1 (Minn. App. November 27, 2017) (considering interlocutory appeal from trial court's decision denying motion to dismiss for lack of subject matter jurisdiction under UCCJEA); *South Carolina Dept. of Social Services* v. *Johnnie B.*, Docket No. 2014-UP-080, 2014 WL 2579937, *1 (S.C. App. February 21, 2014) (concluding that interlocutory appeal challenging subject matter jurisdiction under UCCJEA should be permitted "in the interest of justice and judicial economy"); *Sackett* v. *Roseman*, Docket No. M2002-00587-COA-R9-CV, 2003 WL 22349077, *2 (Tenn. App. July 2, 2003) (trial court granted father's motion for summary judgment, finding that it had jurisdiction under UCCJEA and granting mother permission to seek interlocutory appeal from that judgment). But see *Duffy* v. *Reeves*, 619 A.2d 1094, 1098 n.1 (R.I. 1993) (concluding that permitting interlocutory appeal from trial court's assumption of jurisdiction under emergency jurisdiction provision of UCCJA can cause more harm to child than if appeal was delayed

In re Teagan K.-O.

circumstances, we are persuaded that the present interlocutory appeal meets the second prong of *Curcio*.

II

Having concluded that the father may appeal from the trial court's decision denying his motion to dismiss, we turn to the merits of the appeal. The parties agree that, despite the fact that the Florida court never referred to the UCCJEA in its decision "transferr[ing]" jurisdiction to Connecticut, a state cannot exercise jurisdiction over a neglect petition unless it is authorized to do so under that act. Where the parties' positions diverge is on the question of whether there is a jurisdictional requirement specific to neglect proceedings—the child must have been, or is likely to be, neglected in this state—that also must be met.[15]

until determination of merits, that court would decline to review these interlocutory appeals in absence of extraordinary circumstances in future, and that petition for certiorari should be filed in such cases); see also *Fitzgerald* v. *Bilodeau*, 908 A.2d 1212, 1213 and n.2 (Me. 2006) (denial of motion to dismiss for forum non conveniens under UCCJEA is not immediately appealable in absence of extraordinary circumstances, i.e., narrow exceptions to final judgment rule, such as judicial economy, collateral order, and " 'death knell' " exceptions).

[15] The parties agree that the Florida court did not cite any particular provision of the UCCJEA as a basis for its decision that jurisdiction should be transferred to Connecticut as the more convenient forum, but their briefs to this court assume that the Florida court either did exercise, or could have exercised, jurisdiction under a particular provision of that act. Although we are inclined to agree, the record provides a basis to question that assumption. The Florida department took the position in its appellate brief that Florida had only limited, temporary, emergency jurisdiction because of evidence that the respondents were making plans to leave the state with Teagan to avoid her being taken into that state's custody, which deprived the Florida court of jurisdiction on a more permanent basis under the UCCJEA. Moreover, although the father claimed in his brief that there was a bar to Connecticut's jurisdiction because Teagan would never be neglected in this state, he did not identify any statute imposing such a requirement. Given these concerns, after oral argument, we ordered the parties to file supplemental briefs to address whether *any* ground for making an initial custody determination under the UCCJEA supported Connecticut's exercise of jurisdiction, and, if so, whether General Statutes § 46b-121, which restricts the exercise of jurisdiction in neglect proceedings, nonetheless barred the exercise of jurisdiction.

In re Teagan K.-O.

A

We begin with an overview of the provisions governing jurisdiction over neglect proceedings and then consider the parties' arguments as to their application.

General Statutes § 46b-1 prescribes family relations matters within the jurisdiction of the Superior Court. One such matter is "juvenile matters as provided in section 46b-121 . . . ." General Statutes § 46b-1 (11). Juvenile matters, as provided in General Statutes § 46b-121,[16] "include all proceedings concerning uncared-for, neglected or abused children *within this state* . . . ." (Emphasis added.) General Statutes § 46b-121 (a) (1); see also General Statutes § 46b-121 (a) (2) (defining juvenile matters in criminal session). Some version of this limiting language has been in the statute governing neglect proceedings since 1921. See Public Acts 1921, c. 336, § 3; see also, e.g., General Statutes (Supp. 1943) § 380g; Public Acts 1976, No. 76-436, § 14.

Another family relations matter within the Superior Court's jurisdiction is any matter "affecting or involving . . . custody proceedings brought under the provisions of chapter 815p [the UCCJEA] . . . ." General Statutes § 46b-1 (17). The UCCJEA, adopted by this state in 1999; see Public Acts 1999, No. 99-185; replaced a largely similar scheme adopted in 1978, known as the Uniform Child Custody Jurisdiction Act (UCCJA). See Public Acts 1978, No. 78-318; see also Public Acts 1999, No. 99-185, §§ 39, 40 (repealing General Statutes §§ 46b-90 through 46b-114). The UCCJEA broadly defines a "child custody proceeding" to include proceedings for neglect, abuse, dependency, and termination of parental rights in which custody might be an issue. See General Statutes § 46b-115a (4).

_____

[16] Although § 46b-121 was the subject of amendments in 2018; see Public Acts 2018, No. 18-31, § 27; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

In re Teagan K.-O.

The UCCJEA provision relevant to the present case, General Statutes § 46b-115k, provides in relevant part: "(a) Except as otherwise provided in section 46b-115n [temporary emergency jurisdiction], a court of this state has jurisdiction to make an initial child custody determination if:

"(1) This state is the home state[17] of the child on the date of the commencement of the child custody proceeding;

"(2) This state was the home state of the child within six months of the commencement of the child custody proceeding, the child is absent from the state, and a parent or a person acting as a parent continues to reside in this state;

"(3) A court of another state does not have jurisdiction under subdivisions (1) or (2) of this subsection, the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships;

"(4) A court of another state which is the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum

---

[17] The UCCJEA defines "home state" as "the state in which a child lived with a parent or person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months old, the term means the state in which the child lived from birth with any such parent or person acting as a parent." General Statutes § 46b-115a (7). "[C]ases in other states have concluded [that] time spent in a forum after the filing of a child custody petition may not be counted [toward] the time necessary for home state jurisdiction." *In re Marriage of Sareen*, 153 Cal. App. 4th 371, 379, 62 Cal. Rptr. 3d 687 (2007), cert. denied sub nom. *Sareen* v. *Sareen*, 552 U.S. 1259, 128 S. Ct. 1670, 170 L. Ed. 2d 357 (2008). But see General Statutes § 46b-115n (b) (temporary emergency jurisdiction may become basis for final custody order if, among other things, state has "become" child's home state).

In re Teagan K.-O.

under a provision substantially similar to section 46b-115q [inconvenient forum] or section 46b-115r [unjustifiable conduct],[18] the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships;

"(5) All courts having jurisdiction under subdivisions (1) to (4), inclusive, of this subsection have declined jurisdiction on the ground that a court of this state is the more appropriate forum to determine custody under a provision substantially similar to section 46b-115q or section 46b-115r; or

"(6) No court of any other state would have jurisdiction under subdivisions (1) to (5), inclusive, of this subsection. . . ." (Footnotes added.)

For convenience, these jurisdictional bases are known as home state jurisdiction, significant connection jurisdiction, more appropriate forum jurisdiction, and default or vacuum jurisdiction. See Unif. Child Custody Jurisdiction and Enforcement Act (1997) prefatory note, 9 U.L.A. (Pt. IA) 461–62 (2019); id., § 201, comments (1) and (2), 9 U.L.A. (Pt. IA) 504–506; see also P. Hoff, Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, "The Uniform Child-Custody Jurisdiction and Enforcement Act," Juv. Just. Bull., December, 2001, pp. 2, 5–6, available at https://www.ncjrs.gov/pdffiles1/ojjdp/189181.pdf (last visited June 24, 2020).

---

[18] The decisions of both the Florida court and our trial court imply that the respondents engaged in unjustifiable conduct by leaving Connecticut for the purpose of avoiding the Connecticut department's involvement with Teagan. It is unclear, however, whether General Statutes § 46b-115r would apply under the present circumstances. That statute applies when the person engaging in such misconduct seeks to "invoke [the court's] jurisdiction"; General Statutes § 46b-115r (a); and the respondents clearly were not trying to invoke any court's jurisdiction.

In re Teagan K.-O.

Section 46b-115k of the UCCJEA further provides: "(b) Subsection (a) of this section is the exclusive jurisdictional basis for making a child custody determination by a court of this state.

"(c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination."[19]

The drafters' comment to subsection (c) explains: "[N]either minimum contacts nor service within the [s]tate is required for the court to have jurisdiction to make a custody determination. . . . The requirements of this section, plus the notice and hearing provisions of the [a]ct, are all that is necessary to satisfy due process."[20] Unif. Child Custody Jurisdiction and Enforcement Act (1997) § 201, comment (2), supra, 9 U.L.A. (Pt. IA) 506.

B

The father contends that § 46b-121's "neglected . . . within this state" limitation on jurisdiction is not sat-

_____

[19] The counterpart to this provision in Florida's UCCJEA is structured differently from ours but is the same substantively in all material respects. See Fla. Stat. Ann. § 61.514 (West 2012).

[20] The commentary to the UCCJA, the UCCJEA's predecessor, more clearly explained the rationale for this rule: "There is no requirement for technical personal jurisdiction, on the traditional theory that custody determinations, as distinguished from support actions . . . are proceedings in rem or proceedings affecting status." Unif. Child Custody Jurisdiction Act (1968) § 12, comment, 9 U.L.A. (Pt. IA) 372 (2019). The Restatement (Second) of Judgments explains that custody is treated as a matter of status (i.e., a determination of the relationship between parties, like divorce) and that, if status determinations could be made only with respect to individuals present in the state, "it would have been impossible to determine family relationships in which one party to the relationship was not personally present, for example when a local resident sought a divorce from a spouse who had moved elsewhere. Conceiving the status as a thing overcame this difficulty. The status could be attributed a situs where a party to the relationship had some significant connection, such as residence, and jurisdiction accordingly exercised on the basis of situs of the status." 1 Restatement (Second), Judgments § 7, comment (b), p. 81 (1982); see also *Perry* v. *Ponder*, 604 S.W.2d 306, 316 (Tex. Civ. App. 1980) ("if 'minimum contacts' were required,

In re Teagan K.-O.

isfied and that it controls the outcome of the present case, whereas the commissioner contends that jurisdiction exists under the UCCJEA and that the act controls exclusively because more than one state is implicated. We begin our analysis with the effect of § 46b-121 rather than the UCCJEA for two reasons. First, the Florida court's decision does not clearly reflect that it in fact relied on the UCCJEA to "transfer" jurisdiction to our trial court and, if so, on what jurisdictional basis. That decision is devoid of any express reference to the UCCJEA by name or statutory provision. It invokes none of the UCCJEA's jurisdictional labels commonly relied on by courts, lacks factual findings necessary to support certain jurisdictional grounds, and omits material considerations from the UCCJEA's inconvenient forum analysis.[21] Both of the parties to the Florida proceeding,

cases would arise in which no court would have personal jurisdiction over both parents").

[21] Courts have held that all relevant factors must be considered in strict compliance with the inconvenient forum provision. See *In re McAndrews*, 171 N.H. 214, 220, 193 A.3d 834 (2018) (citing cases). There is no indication that the Florida court considered two manifestly relevant enumerated factors—the distance between Florida and Connecticut and the parties' relative financial circumstances. See General Statutes § 46b-115q (b) (3) and (4). Although the respondents did not make specific arguments on these factors, the father submitted a pay stub reflecting an hourly wage of less than $10 an hour, which suggests that the respondents' financial resources pale in comparison to the resources of a state child protection agency. In addition to its failure to consider relevant enumerated factors, which are not exclusive, the Florida court's decision reflects no consideration of legitimate concerns that the father has raised in this court about the impact of Connecticut's exercise of jurisdiction on visitation and on the provision of services to rehabilitate the respondents and reunify the family. Despite the fact that neither respondent raised those issues in the trial court, their significance should have been recognized by the court on its own initiative. Review of the propriety of the Florida court's inconvenient forum determination, however, and the effect of the respondents' failure to timely raise relevant considerations are matters exclusively within the province of the Florida courts.

We note that our trial court communicated Connecticut's willingness to assume jurisdiction, via a telephone message. Insofar as our trial court represented that Teagan's case would be added to the pending case pertaining to her sibling if her case was transferred, we observe that no such decision could be rendered without first giving the respondents an opportunity to object to the consolidation. See Practice Book § 35a-6A (requiring

of which the Connecticut commissioner was not one,
agree that the court only was exercising temporary emer-
gency jurisdiction and was not exercising jurisdiction
under any one of the grounds prescribed in § 46b-115k.

By contrast, it is undisputed that § 46b-121's territo-
rial limitation on jurisdiction—"neglected . . . chil-
dren within this state"—is not satisfied.[22] Although this

court to consider whether consolidation would cause injustice). Had the
courts engaged in a communication on the record, as the UCCJEA demands;
see General Statutes § 46b-115h; the aforementioned issues might have been
explored in a more meaningful way. See Fla. Stat. Ann. § 61.511 (West 2012)
(requiring, in addition to verbatim record of communication, that "[t]he
court shall allow the parties to participate in the communication," at which
time "they must be given the opportunity to present facts and legal arguments
before a decision on jurisdiction is made").

[22] "The term territorial jurisdiction . . . refers to the connection between
the territorial authority of the court and the action that has been brought
before the court. 1 Restatement (Second), Judgments [c. 2], introductory
note, p. 22 [1982]." (Internal quotation marks omitted.) *Trichilo* v. *Trichilo*,
190 Conn. 774, 779–80 n.7, 462 A.2d 1048 (1983). It reflects the concept that,
because governments have an authority that generally is defined by reference
to their legal boundaries or territorial limits, the courts constituted by them
have an authority that is correspondingly defined in territorial terms. See
1 Restatement (Second), supra, § 4, comment (a), p. 56; see also General
Statutes § 51-1a (b) ("[t]he territorial jurisdiction of the Supreme Court,
the Appellate Court, and the Superior Court shall be coextensive with the
boundaries of the state"). "Hence, outside the territorial limits of a court's
jurisdiction, the coercive effectiveness of its judgment depends upon the
judgment's being given recognition by the authorities of another government,
under a principle of comity or by virtue of legal provisions such as the
[f]ull [f]aith and [c]redit [c]lause of the [United States] [c]onstitution." 1
Restatement (Second), supra, c. 2, introductory note, p. 23.

Although the concurring and dissenting justice places significant weight
on the characterization of § 46b-121 as a reflection of territorial jurisdiction,
the distinction between territorial jurisdiction and subject matter jurisdiction
is not always clear; territorial jurisdiction has been viewed as combining
aspects of subject matter jurisdiction with personal jurisdiction. See id.,
introductory note, p. 28 ("Whatever term is used [to refer to subject matter
jurisdiction], the concept of authority to decide a particular type of legal
controversy is sometimes difficult or impossible to distinguish from that of
territorial jurisdiction. For example, when reference is made to a court's
authority to determine a matter of status or to determine interests in prop-
erty, it can be said that the state's connection to the status or the property
is a matter of territorial jurisdiction or that it is one of subject matter
jurisdiction."); see also, e.g., *B.J.P.* v. *R.W.P.*, 637 A.2d 74, 80–81 (D.C. 1994)
(Ferren, J., concurring) ("There are two species of jurisdiction over the
subject matter. The first—the one commonly meant when referring to 'sub-
ject matter jurisdiction'—concerns the 'competence' of the court to adjudi-

In re Teagan K.-O.

phrase has not previously been construed by our courts,
whether it means that neglect has occurred or likely
will occur within this state, that a child neglected else-
where is currently present in this state, and/or that the
child's domicile is in this state, none of these conditions
exists.[23] We agree with the father that the failure to satisfy

cate a particular kind of controversy; e.g., divorce or child custody. . . .
The second species is called 'territorial jurisdiction,' which requires the
court to have a geographical relationship to a particular 'thing' or 'status'
. . . in addition to the competence to adjudicate the type of claim at issue;
e.g., jurisdiction over custody where the child is domiciled. Territorial juris-
diction often combines aspects of classic subject matter jurisdiction (e.g.,
a status such as child custody) with those of in personam jurisdiction (e.g.,
a particular parent's custody of a particular child).'' (Citations omitted;
footnote omitted.)); *Feriole* v. *Feriole*, 468 So. 2d 1090, 1091 (Fla. App. 1985)
(''Whenever a minor child resides in the state, a circuit court has inherent
jurisdiction to entertain matters pertaining to custody and [issue] any orders
appropriate to that child's welfare. . . . For many years it was the law of
this state that a court had no jurisdiction to initially adjudicate the question
of the custody of a minor child unless that child was physically present
within the territorial jurisdiction of the court at the time the [action] seeking
an adjudication of his custody was filed.'' (Citation omitted.)).

The only material consequence flowing from characterizing a condition
as an expression of territorial jurisdiction, rather than subject matter jurisdic-
tion, is the possibility of the former being subject to waiver. See 1
Restatement (Second), supra, c. 2, introductory note, p. 28. But see *State*
v. *Dudley*, 364 S.C. 578, 582, 614 S.E.2d 623 (2005) (''Although territorial
jurisdiction is not a component of subject matter jurisdiction, we hold that
it is a fundamental issue that may be raised by a party or by a court at any
point in the proceeding. . . . The exercise of extraterritorial jurisdiction
implicates the state's sovereignty, a question so elemental that we hold it
cannot be waived by conduct or by consent.'' (Citation omitted; footnote
omitted.)). Waiver is not a concern in the present case, however, because
the father has consistently objected to Connecticut's exercise of jurisdiction
over the case due to Teagan's lack of presence in this state.

[23] This broad construction is consistent with the historical treatment of
territorial jurisdiction and custody jurisdiction. See 1 Restatement (Second),
Conflict of Laws § 79, p. 237 (1971) (Custody of the Person); 1 Restatement
(Second), Judgments § 4, p. 55 (1982) (Constitutional and Legislative Deter-
minants of Territorial Jurisdiction); 1 Restatement (Second), Judgments § 7,
p. 79 (1982) (Jurisdiction over Status); see also *Castle* v. *Castle*, 247 So. 2d
455, 456 (Fla. App. 1971) (Walden, J., dissenting) (''[T]wenty-seven states
. . . are unanimous in holding that even though children may be physically
without the state, power exists in the court to make an award of custody
of children domiciled within the state. See [C. Drechsler, Annot., 'Jurisdiction

In re Teagan K.-O.

§ 46b-121 prevents Connecticut from exercising juris-
diction over the neglect petition, irrespective of whether
the conditions for exercising jurisdiction under the
UCCJEA would be met.

We begin with the observation that, prior to the enact-
ment of the UCCJEA, there was some question as to
whether its predecessor, the UCCJA, applied to neglect
and dependency proceedings. See Unif. Child Custody
Jurisdiction and Enforcement Act (1997) prefatory
note, supra, 9 U.L.A. (Pt. IA) 463. The UCCJEA made
clear that it did apply to such proceedings. See id., § 102
(4), 9 U.L.A. (Pt. IA) 475. When our legislature adopted
the broadly applicable UCCJEA, it did not eliminate the
territorial limitation in § 46b-121 specific to neglect pro-
ceedings.

Although many states do not impose such a territor-
ial limitation,[24] doing so is not unique to Connecticut or
to neglect proceedings. Such a limitation may be dic-
tated by statute or by common law. See, e.g., La. Code
Civ. Proc. Ann. art. 10 (A) (Cum. Supp. 2020) (''[a] court
which is otherwise competent under the laws of this
state has jurisdiction of the following actions or pro-
ceedings only under the following conditions . . . (5)
[a] proceeding to obtain the legal custody of a minor

of Court to Award Custody of Child Domiciled in State but Physically Outside
It,' 9 A.L.R.2d 434, 442, § 5 (1950)].''); *In re Gonzales*, 25 Ill. App. 3d 136,
143, 323 N.E.2d 42 (1974) (''The [s]tate's interest in this particular case in
which the parent is a nonresident is established in that the [s]tate, as [p]arens
patriae, has a responsibility to care for and protect any child within its
borders. . . . Consequently, the legal residence of the child does not techni-
cally affect the jurisdiction of the court, so long as the child is physically
present within the [s]tate.'' (Citation omitted.)).

[24] See, e.g., Ark. Code Ann. § 9-27-306 (a) (1) (2015) (''[t]he circuit court
shall have exclusive original jurisdiction of and shall be the sole court for
the following proceedings governed by this subchapter, including without
limitation . . . (B) Proceedings in which a juvenile is alleged to be depen-
dent or dependent-neglected''); Colo. Rev. Stat. § 19-1-104 (1) (2019) (''the
juvenile court has exclusive original jurisdiction in proceedings . . . (b)
Concerning any child who is neglected or dependent, as set forth in section
19-3-102'').

In re Teagan K.-O.

if he is domiciled in, or is in, this state''); Mich. Comp.
Laws Serv. § 712A.2 (b) (LexisNexis Cum. Supp. 2019)
(neglected juvenile ''found within the county''); Mo.
Ann. Stat. § 211.031 1. (1) (West 2017) (neglected child
''who may be a resident of or found within the county'');
Mont. Code Ann. § 41-3-103 (1) (a) (2019) (neglected
youth ''who is within the state of Montana for any pur-
pose''); N.H. Rev. Stat. Ann. § 170-C:3 (2014) (''jurisdic-
tion over petitions to terminate the parent-child rela-
tionship when the child involved is present in the state
or is in the legal custody or legal guardianship of an
authorized agency located in the state''); N.C. Gen. Stat.
§ 7B-1101 (2019) (''termination of parental rights to any
juvenile who resides in, is found in, or is in the legal
or actual custody of a county department of social ser-
vices or licensed child-placing agency in the district at
the time of filing of the petition or motion''); Okla. Stat.
Ann. tit. 10A, § 2-2-102 (A) (1) (West 2018) (jurisdiction
where child ''resides,'' ''is found,'' or ''is alleged to be or
is found to be in need of supervision''); R.I. Gen. Laws
§ 14-1-5 (1) (Cum. Supp. 2019) (neglected child ''resid-
ing or being within the state''); W. Va. Code Ann. § 49-
4-601 (a) (LexisNexis 2015) (''in the county in which
the child resides, or if the petition is being brought by
the department, in the county in which the custodial
respondent or other named party abuser resides, or in
which the abuse or neglect occurred''); *Arizona Dept.
of Economic Security* v. *Grant ex rel. Maricopa*, 232
Ariz. 576, 581, 307 P.3d 1003 (App. 2013) (recognizing
that jurisdiction exists, not only when neglect or abuse
of child occurred in state, but also when child subject
to abuse or neglect is present in state); *In re Shaw*, 449
S.W.2d 380, 382 (Mo. App. 1969) (''[t]o expand a juvenile
court's jurisdiction to include children outside the
court's territorial boundaries would contravene a gen-
eral principle of jurisprudence''); *In re Juvenile 2002-
098*, 148 N.H. 743, 746–47, 813 A.2d 1197 (2002) (relying
on traditional parens patriae power of state and broad

In re Teagan K.-O.

language of state statute to allow court to exercise jurisdiction over "any case involving a child found within the [s]tate who is alleged to have been abused or neglected, no matter where the abuse or neglect is alleged to have occurred"); *In re Westchester County Dept. of Social Services*, 211 App. Div. 2d 235, 236–38, 627 N.Y.S.2d 735 (1995) (although abuse occurred out of country, court could exercise jurisdiction because child was then in state).

Several courts have considered whether such a territorial limitation must be satisfied even though the matter is a child custody proceeding subject to the UCCJEA. Some of these cases involved the UCCJA, the predecessor to the UCCJEA, but they are equally relevant because both acts prescribed the same grounds for the exercise of initial custody jurisdiction, including home state, significant connection, etc., and deemed the physical presence of the child not to be a prerequisite to jurisdiction. See Unif. Child Custody Jurisdiction Act (1968) § 3, 9 U.L.A. (Pt. IA) 106–107 (2019). Although taking different approaches, all of them indicate that the territorial limitation must be satisfied.

In several of these cases, the courts determined that the limitation specific to the matter (e.g., neglect) and the conditions under the UCCJEA both had to be met for the court to exercise jurisdiction. See *State ex rel. R.P.* v. *Rosen*, 966 S.W.2d 292, 297–98 (Mo. App. 1998) (framing issue as whether Missouri has jurisdiction over abuse and neglect proceeding both under statute vesting juvenile court with jurisdiction in proceedings "[i]nvolving any child or person seventeen years of age who may be a resident of or found within the county and who is alleged to be in need of care and treatment" and under UCCJA (emphasis omitted; internal quotation marks omitted)); *In re K.U.-S.G.*, 208 N.C. App. 128, 131, 702 S.E.2d 103 (2010) ("Our Juvenile Code grants district courts 'exclusive original jurisdiction to

In re Teagan K.-O.

hear and determine any petition or motion relating to termination of parental rights to any juvenile who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of filing of the petition or motion.' . . . Nevertheless, the jurisdictional requirements of the UCCJEA also must be satisfied for the [D]istrict [C]ourt to have authority to adjudicate termination actions.'' (Citation omitted.)); *In re D.D.J.*, 177 N.C. App. 441, 443, 628 S.E.2d 808 (2006) (concluding that subject matter jurisdiction was lacking under termination of parental rights statute because child neither resided in state, was found in state, nor was in state's custody when petition was filed, and there was no further consideration of UCCJEA); *In re Bean*, 132 N.C. App. 363, 366, 511 S.E.2d 683 (1999) (court must engage in ''a two-part process'' to determine whether it has jurisdiction, under requirements of both UCCJA and those under parental termination statute); *In re Leonard*, 77 N.C. App. 439, 440–41, 335 S.E.2d 73 (1985) (holding that, despite fact that North Carolina court had jurisdiction under UCCJA, state lacked jurisdiction because requirement of termination of parental rights statute—child resided or was found in district at time petition was filed—was not met: ''[although] a determination of jurisdiction over child custody matters will precede a determination of jurisdiction over parental rights, it does not supplant the parental rights proceedings'' (emphasis omitted));[25] see also *Arizona Dept. of Economic Security* v. *Grant ex rel. Maricopa*, supra, 232 Ariz. 579–81 (first determining that jurisdiction was proper under UCCJEA and then rejecting argument that subject matter jurisdiction was improper because alleged abuse or neglect occurred outside of state, citing case law from New York and New Hampshire support-

_____

[25] The concurring and dissenting justice discounts this North Carolina case because the termination statute provided that state's District Court with ''*exclusive* original jurisdiction'' over the termination matter. (Emphasis added; internal quotation marks omitted.) *In re Leonard*, supra, 77 N.C.

In re Teagan K.-O.

ing exercise of jurisdiction when neglected or abused child is found within state, even if abuse and neglect did not occur in state).

In two other cases, the courts recognized the controlling force of the territorial limitation but limited its scope of operation. Both cases involved statutes vesting the state's court with " 'exclusive original jurisdiction' " over proceedings to terminate parental rights with respect to a child who resides or is found within the state. *In re G. B.*, 167 N.H. 99, 102, 105 A.3d 615 (2014); accord *In re H.L.A.D.*, 184 N.C. App. 381, 385, 646 S.E.2d 425 (2007), aff'd, 362 N.C. 170, 655 S.E.2d 712 (2008). The courts distinguished "exclusive, original" jurisdiction subject to the territorial limitation in the termination statute from "exclusive, continuing" jurisdiction in the UCCJEA,[26] giving each an independent sphere of operation. See *In re G. B.*, supra, 105 (The forum's original jurisdiction statute and the UCCJEA's continuing jurisdiction provision "independently grant jurisdiction under the circumstances set forth in each. That jurisdiction under one is not supported on a given set of facts does not preclude jurisdiction under the other.");[27] *In re H.L.A.D.*, supra, 386–87 (noting distinction between " 'exclusive, original jurisdiction' " of termination statute and " 'exclusive, continuing jurisdiction' " of UCCJEA, and, although former authorizes court to adjudicate

App. 440. This exclusivity language is commonly used, however, to designate which of North Carolina's courts, i.e., District Court or Superior Court, has jurisdiction, not to designate which state's court has jurisdiction. See, e.g., N.C. Gen. Stat. §§ 7A-241 and 7A-272 (2019).

[26] Conditions for exercising exclusive, continuing jurisdiction under the UCCJEA are codified in General Statutes §§ 46b-115*l* and 46b-115m.

[27] The commissioner views this New Hampshire case as supporting her position, reading it as standing for the proposition that the UCCJEA has an independent sphere of operation, such that it applies when more than one state has a claim to jurisdiction. We do not think this is a fair reading of the case. Nowhere is this more evident than the New Hampshire court's reliance on the reasoning of the North Carolina court in *In re H.L.A.D.*, supra, 184 N.C. App. 381.

termination of parental rights when circumstances specified exist, "[t]his . . . does not preclude the [D]istrict [C]ourt's exercise of jurisdiction in circumstances in which the court already has 'exclusive, continuing jurisdiction' pursuant to the UCCJEA''). The courts deemed the territorial limitation applicable to initial custody determinations but not to modifications of such a determination.

The only cases we have found that have not deemed the territorial limits controlling support, rather than undermine, the father's claim in the present case. Louisiana appears to be one of the only states with a statute prescribing a territorial limitation specifically applicable to custody cases. Cf. *Feriole* v. *Feriole*, 468 So. 2d 1090, 1091 (Fla. App. 1985) ("For many years it was the law of [Florida] that a court had no jurisdiction to initially adjudicate the question of the custody of a minor child unless that child was physically present within the territorial jurisdiction of the court at the time the [action] seeking an adjudication of his custody was filed. . . . However, Florida adopted the [UCCJA] effective October 1, 1977, which superseded prior Florida law in this area." (Citation omitted.)). Article 10 of the Louisiana Code of Civil Procedure provides in relevant part: "A court which is otherwise competent under the laws of this state has jurisdiction of the following actions or proceedings only under the following conditions . . . [a] proceeding to obtain the legal custody of a minor *if he is domiciled in, or is in, this state*. . . ." (Emphasis added.) La. Code Civ. Proc. Ann. art. 10 (A) (5) (2014). In *Gusman* v. *Gusman*, 598 So. 2d 1256 (La. App. 1992), the court considered an appeal from the trial court's decision dismissing a custody matter filed by the father on the ground that Louisiana did not have jurisdiction over the matter because Virginia, where the children and the mother presently resided, was the children's home state under the UCCJA. See id., 1257–58. On appeal, the father argued

that Louisiana had jurisdiction under the predecessor to article 10 (A) (5) of the Louisiana Code of Civil Procedure because it was his domicile and, in turn, his children's domicile. Id., 1257. The Louisiana Court of Appeal rejected that argument, holding ''that when Louisiana adopted the [UCCJA] the [l]egislature intended that law to supersede all laws in conflict with it, including [the predecessor to article 10 (A) (5)]. [Although] this does not mean [that article 10 (A) (5)] was facially repealed, it does mean that it was repealed as to its applicability when in conflict with the [UCCJA] . . . .'' Id., 1258. In *Banerjee* v. *Banerjee*, 258 So. 3d 699 (La. App. 2017), the Louisiana Court of Appeal stated, perhaps more clearly, in a case arising under the UCCJEA: ''Louisiana courts have jurisdiction over a minor's status in a 'proceeding to obtain the legal custody of a minor if he is domiciled in, or is in, this state.' La. Code Civ. [Proc. Ann.] art. 10 (A) (5) [2014]. However, a second tier of inquiry into the jurisdiction over custody issues exists under the UCCJEA . . . . Even if a Louisiana court has subject matter jurisdiction, that jurisdiction must be declined based on limitations imposed by the UCCJEA.'' (Citation omitted.) *Banerjee* v. *Banerjee*, supra, 701–702.

These Louisiana cases stand for the unremarkable proposition that, even if jurisdiction is *authorized* under the territorial limitation, the exercise of jurisdiction may be limited or precluded in a given case by the UCCJEA. See *Rosen* v. *Celebrezze*, 117 Ohio St. 3d 241, 249, 883 N.E.2d 420 (2008) (''the mere fact that the Ohio court has basic statutory jurisdiction to determine custody matters in [legal separation] and divorce cases . . . does not preclude a more specific statute like [a provision under Ohio's UCCJA] from patently and unambiguously divesting the court of such jurisdiction'' (citations omitted)). Our concern in the present case, of course, is with the converse—whether, when the jurisdictional requirements of a statute specific to the

matter at hand are not met, the UCCJEA nonetheless permits the exercise of jurisdiction.

Not only do the cases previously discussed indicate that this question must be answered in the negative, but so too does the purpose of the UCCJEA. A paramount purpose of the act is to determine which state having jurisdiction will be permitted to exercise it when two or more states have *concurrent* jurisdiction.[28] See *In re Marriage of Sareen*, 153 Cal. App. 4th 371, 376, 62 Cal. Rptr. 3d 687 (2007) ("UCCJEA is the exclusive method of determining subject matter jurisdiction in custody disputes involving other jurisdictions"), cert. denied sub nom. *Sareen* v. *Sareen*, 552 U.S. 1259, 128 S. Ct. 1670, 170 L. Ed. 2d 357 (2008); *Brown* v. *Brown*, 195 Conn. 98, 107, 486 A.2d 1116 (1985) (UCCJA "envisages that where concurrent jurisdiction exists, only one state

_____

[28] The UCCJEA, like its predecessor, is aimed at achieving the following purposes: "(1) Avoid jurisdictional competition and conflict with courts of other [s]tates in matters of child custody which have in the past resulted in the shifting of children from [s]tate to [s]tate with harmful effects on their well-being;

"(2) Promote cooperation with the courts of other [s]tates to the end that a custody decree is rendered in that [s]tate which can best decide the case in the interest of the child;

"(3) Discourage the use of the interstate system for continuing controversies over child custody;

"(4) Deter abductions of children;

"(5) Avoid relitigation of custody decisions of other [s]tates in this [s]tate; [and]

"(6) Facilitate the enforcement of custody decrees of other [s]tates . . . ." Unif. Child Custody Jurisdiction and Enforcement Act (1997) § 101, comment, supra, 9 U.L.A. (Pt. IA) 474. Conflicting custody orders and the enforcement of orders had been a problem in part because there was some question as to whether custody orders fell outside the purview of the full faith and credit clause of the United States constitution. See 1 Restatement (Second), Conflict of Laws § 79, comment (c) and reporter's note to comment (c), pp. 238–39, 241–42 (1971). Noncustodial parents had been using the child to forum shop for a more favorable custody arrangement, as the child's presence was deemed a basis for a court's jurisdiction. See, e.g., *Bellew* v. *Larese*, 288 Ga. 495, 499, 706 S.E.2d 78 (2011); *In re Felty* v. *Felty*, 66 App. Div. 3d 64, 71–72, 882 N.Y.S.2d 504 (2009); see also P. Hoff, supra, p. 2.

In re Teagan K.-O.

should *exercise* that jurisdiction" (emphasis in original)); *In re J.R.*, 33 A.3d 397, 400 (D.C. 2011) ("[the UCCJEA] establishes the bases for subject matter jurisdiction over custody matters in the District [of Columbia], setting forth rules to govern jurisdiction when more than one state may be involved, in order to prevent jurisdictional conflicts"); *Ball* v. *McGowan*, 497 S.W.3d 245, 249 (Ky. App. 2016) ("Broadly speaking, [the UCCJEA's] purpose is to avoid jurisdictional conflict and competition in custody matters . . . and to promote uniformity. . . . To effect this purpose, the UCCJEA provides rules for determining jurisdiction in custody cases involving multiple states." (Citations omitted; footnote omitted; internal quotation marks omitted.)); *Rosen* v. *Celebrezze*, supra, 117 Ohio St. 3d 248 ("the primary purpose of the [UCCJEA is] . . . to avoid jurisdictional competition"); *In re R.W.*, 191 Vt. 108, 126–27, 39 A.3d 682 (2011) ("[t]he UCCJA was created to end the interstate custody jurisdictional tug-of-war between states" (internal quotation marks omitted)); *In re Custody of A.C.*, 165 Wn. 2d 568, 574, 200 P.3d 689 (2009) ("The UCCJEA arose out of a conference of states in an attempt to deal with the problems of competing jurisdictions [issuing] conflicting interstate child custody orders, forum shopping, and the drawn out and complex child custody legal proceedings often encountered by parties where multiple states are involved. . . . Most states have adopted the UCCJEA in order to reduce conflicting orders regarding custody and placement of children." (Citations omitted; footnote omitted.)); *In re NC*, 294 P.3d 866, 872 (Wyo. 2013) ("[t]he dominant objective of the [UCCJEA] is to eliminate the simultaneous exercise of jurisdiction over custody disputes by more than one state" (internal quotation marks omitted)).

The UCCJEA's purpose of preventing the exercise of concurrent jurisdiction is reflected in that act's designa-

tion of § 46b-115k (a) as "the exclusive jurisdictional basis for making a child custody determination by a court of this state." General Statutes § 46b-115k (b). This provision recognizes that, even though a state may have subject matter jurisdiction over the custody matter, it may be required to decline to exercise that jurisdiction if § 46b-115k (a) designates another state as having priority.

This means, as many courts have recognized, that the UCCJEA, like its predecessor, does not create jurisdiction but prescribes the circumstances under which jurisdiction that otherwise is conferred by constitution or statute can be exercised in a given case. See, e.g., *In re Marriage of Holder*, Docket No. F036747, 2002 WL 443397, *5 (Cal. App. March 20, 2002) ("[d]espite the existence of fundamental jurisdiction [in the California Superior Court], the UCCJEA severely limits the exercise of superior court custody jurisdiction where there are interstate or international aspects to the litigation"); *McCormick* v. *Robertson*, 15 N.E.3d 968, 974 (Ill. App. 2014) ("whereas the UCCJEA may procedurally limit the circumstances in which a [C]ircuit [C]ourt may exercise its power to render a custody determination . . . it may not deprive the [C]ircuit [C]ourt of its constitutionally derived [subject matter] jurisdiction to decide the matter in the first place" (citation omitted)), aff'd, 28 N.E.3d 795 (Ill. 2015); *Williams* v. *Williams*, 555 N.E.2d 142, 144–45 (Ind. 1990) ("Resolution of the subject matter jurisdiction issue involves determining whether the claim advanced falls within the general scope of authority conferred upon the court by the constitution or statute. . . . The authority to hear child custody cases is not directly granted by the UCCJA. Rather, [the UCCJA] merely operates to restrict the existing power of courts to hear custody cases." (Citation omitted.)); *In re A.A.-F.*, 310 Kan. 125, 135, 444 P.3d 938 (2019) ("By statute, Kansas district courts have general original jurisdiction of all matters, both civil

In re Teagan K.-O.

and criminal, unless otherwise provided by law. . . . And, more specific to this case, the Revised Kansas Code for Care of Children generally confers original jurisdiction on Kansas courts to hold proceedings concerning any child who may be a child in need of care. . . . But the [l]egislature placed limits on this jurisdiction, making it [s]ubject to the [UCCJEA] . . . .'' (Citations omitted; internal quotation marks omitted.)); *State ex rel. J.W.*, 975 So. 2d 841, 845 (La. App. 2008) (''[t]he UCCJA provides jurisdictional limitations that require a court that otherwise has subject matter jurisdiction to decline to exercise it''); *Hightower* v. *Myers*, 304 S.W.3d 727, 733 (Mo. 2010) (''This case is a civil case. Therefore, the trial court had constitutionally vested subject matter jurisdiction over the dispute. . . . The [C]ircuit [C]ourt's statutory or [common-law] authority to grant relief in a particular case differs from the [C]ircuit [C]ourt's constitutionally granted subject matter and personal jurisdiction. . . . In this respect, the UCCJA jurisdiction provisions inform a court whether it lacks authority to modify custody because of the statutory limitations. . . . [T]he UCCJA provisions at issue do not remove subject matter jurisdiction from the court.'' (Citations omitted.)); *DeLima* v. *Tsevi*, 301 Neb. 933, 937, 921 N.W.2d 89 (2018) (''We have previously said that subject matter jurisdiction over a child custody proceeding is governed exclusively by the UCCJEA. . . . Our use of the word 'exclusively' in this context was slightly imprecise, because there are other statutes outside the UCCJEA that confer jurisdiction to decide child custody matters. . . . But while other statutes may confer jurisdiction generally, § 42-351 [of the Revised Statutes of Nebraska] directs courts to determine whether jurisdiction exists over a specific child custody proceeding under the UCCJEA.'' (Citations omitted.)); *Lustig* v. *Lustig*, 560 N.W.2d 239, 242 (S.D. 1997) (''Before a court may decide custody, it must possess jurisdiction. . . . Courts must also adhere to

In re Teagan K.-O.

the jurisdictional requirements of the UCCJA and the prohibitions of the Parental Kidnapping Prevention Act . . . .'' (Citation omitted.)); see also *Ashburn* v. *Baker*, 256 Ga. 507, 509, 350 S.E.2d 437 (1986) (''Although the [UCCJA] is the last expression of the legislature, it does not expressly repeal any particular provisions of the Civil Practice Act, nor the existing statutory provisions covering divorce, custody, alimony, and child support procedures. Finding this to be true, we will consider the requirements of the [UCCJA] in pari materia with the other applicable provisions of law pertinent thereto.'' (Internal quotation marks omitted.)); 2 A. Haralambie, Handling Child Custody, Abuse and Adoption Cases (3d Ed. 2009) § 11:4, p. 215 (''Most statutes provide that the court has jurisdiction if the child resides or is present or has property in the state. Because guardianship of the person affects the custody of children, the [UCCJEA] and the federal Parental Kidnapping Prevention Act . . . apply as limitations on the court's jurisdiction.'' (Footnotes omitted.)); W. Hogoboom et al., California Practice Guide: Family Law (2019) § 5:28.4, p. 5-14 (''[e]ven if it otherwise has subject matter jurisdiction over the proceeding, a California court may have to yield to another state's jurisdiction under the Federal Parental Kidnapping Prevention Act . . . and the [UCCJEA]'' (citation omitted; emphasis omitted)); 7 J. Levin, Nichols Illinois Civil Practice (2015) § 123:168, p. 286 (''[w]hile the UCCJEA may procedurally limit circumstances in which a circuit court may exercise its power to render a custody determination, it does not deprive a circuit court of its constitutionally derived jurisdiction to decide the matter in the first place''); 10 (Pt. 1) A. Scheinkman, West's McKinney's Forms: Matrimonial and Family Law (2011) § 20:55, pp. 191–92 (''[u]nder the [UCCJEA], a New York court which is otherwise competent to decide [child custody] matters has jurisdiction to make an initial [child custody] determination only if one of four statutory tests is met'').

In re Teagan K.-O.

The fact that the UCCJEA resolves competing claims of jurisdiction and does not itself create jurisdiction is most clearly manifested in its inconvenient forum provision, which allows a court having jurisdiction to decline to exercise jurisdiction in favor of another state's court. See General Statutes § 46b-115k (a) (5); General Statutes § 46b-115p. Inconvenient forum is a doctrine that historically applies only when the matter could have been initiated in the more convenient forum in the first instance. See, e.g., *American Dredging Co.* v. *Miller*, 510 U.S. 443, 447–48, 114 S. Ct. 981, 127 L. Ed. 2d 285 (1994) (doctrine of forum non conveniens applies "when an alternative forum has jurisdiction to hear [a] case" (internal quotation marks omitted)), quoting *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 241, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981); see also *Brown* v. *Brown*, supra, 195 Conn. 108 n.17 ("[e]ven before the adoption of the UCCJA, the doctrine of forum non conveniens was recognized as applicable to child custody disputes over which the court otherwise had jurisdiction; see, e.g., *Clark* v. *Superior Court*, 73 Cal. App. 3d 298, 309, 140 Cal. Rptr. 709 (1977) . . . *Loonan* v. *Marino*, 179 N.J. Super. 164, 168, 430 A.2d 975 (1981)"). There is no evidence that the UCCJEA intended its inconvenient forum provision to operate differently. See *Kedy* v. *A.W. Chesterton Co.*, 946 A.2d 1171, 1182 (R.I. 2008) (inconvenient forum provision in UCCJEA "mends the fabric of the [common-law doctrine], rather than weakening it"); see also *Brown* v. *Brown*, supra, 107–108 (The UCCJA "contemplates that considerations that evolved under the traditional [common-law] doctrine of forum non conveniens . . . are not supplanted by the inconvenient forum provision of the UCCJA. . . . The [common-law] principle of forum non conveniens provides that a court may resist *imposition* upon its jurisdiction even when it has jurisdiction." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.)).

In re Teagan K.-O.

To the contrary, the language in the UCCJEA reflects an intention to conform to the doctrine's common-law operation. The UCCJEA says nothing about one state *transferring* its subject matter jurisdiction to, or *conferring* its jurisdiction upon, another state.[29] Instead, it allows a state having jurisdiction to ''decline'' to exercise its jurisdiction on the basis of its inconvenient forum determination. General Statutes § 46b-115q (a) and (d). If it so declines, it ''shall stay'' the proceeding ''upon condition that a child custody proceeding be promptly *commenced* in another designated state . . . .'' (Emphasis added.) General Statutes § 46b-115q (c). Jurisdiction cannot be transferred if it is retained during a stay. A proceeding cannot be commenced in a state that lacks jurisdiction. Perhaps the most obvious indication that the more appropriate forum must have subject matter jurisdiction when that determination is made is that the UCCJEA designates ''any agreement of the parties as to which state should assume jurisdiction'' as a relevant factor in deciding whether another state would be a more convenient forum. General Statutes § 46b-115q (b) (5). It is black letter law that courts do not obtain subject matter jurisdiction by consent or agreement of the parties. See, e.g., *Angersola* v. *Radiologic Associates of Middletown, P.C.*, 330 Conn. 251, 272, 193 A.3d 520 (2018); *Hayes* v. *Beresford*, 184 Conn. 558, 562, 440 A.2d 224 (1981).

---

[29] Nor does the transfer rule that the Florida court cited as authority for its decision. Rule 8.205 (c) of the Florida Rules of Juvenile Procedure provides: ''If it should appear at any time that *an action is pending in another state*, the court may transfer jurisdiction over the action to a more convenient forum state, may stay the proceedings, or may dismiss the action.'' (Emphasis added.) This language plainly reflects that the more convenient forum state already had jurisdiction over the action prior to the transfer. The record suggests that the Florida court viewed the case pending in Connecticut regarding Teagan's sibling, J, and Teagan's case to be part of the same ''action,'' in reliance on a telephone message it had received from the Connecticut trial court that Teagan's case would be added to J's case if the Florida court declined to exercise jurisdiction.

In re Teagan K.-O.

In fact, although the commentary to the UCCJEA specifically characterizes the jurisdiction provisions as relating to "subject matter jurisdiction"; see Unif. Child Custody Jurisdiction and Enforcement Act (1997) § 201, comment (2), supra, 9 U.L.A. (Pt. IA) 506; some courts and commentators have taken issue with that characterization and instead view them as prescribing conditions for exercising personal jurisdiction. See, e.g., *Williams* v. *Williams*, supra, 555 N.E.2d 145 (referring to UCCJA); *Harris* v. *Young*, 473 N.W.2d 141, 143 (S.D. 1991) (same); B. Atwood, "Child Custody Jurisdiction and Territoriality," 52 Ohio St. L.J. 369, 375 and n.36 (1991) (citing disagreement among commentators and among courts); see also 750 Ill. Comp. Stat. Ann. 60/208 (West 2019) (referring to UCCJEA as prescribing personal jurisdiction); *Friedman* v. *Eighth Judicial District Court ex rel. Clark*, 127 Nev. 842, 848 n.5, 264 P.3d 1161 (2011) (noting that it would have been more appropriate for UCCJEA to refer to "exclusive venue" instead of "subject matter jurisdiction" but using latter for consistency (internal quotation marks omitted)), quoting *In re Custody of A.C.*, supra, 165 Wn. 2d 573 n.3. This view is lent some support by a statement in the commentary to the UCCJA, the UCCJEA's predecessor, explaining that, under the significant connection ground for jurisdiction, "[t]here must be maximum rather than minimum contact with the state"; Unif. Child Custody Jurisdiction Act (1968) § 3, comment, supra, 9 U.L.A. (Pt. IA) 108; suggesting that the UCCJA's standards exceed the due process requirements for personal jurisdiction prescribed by the United States Supreme Court. See, e.g., *International Shoe Co.* v. *Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (prescribing minimum contacts standard).

Irrespective of whether we characterize the conditions under the UCCJEA as personal jurisdiction or jurisdictional facts necessary to the exercise of subject

In re Teagan K.-O.

matter jurisdiction, the effect is the same in the present case. Because the UCCJEA does not confer subject matter jurisdiction on our courts but instead determines whether our courts may exercise existing jurisdiction or must defer to another state's jurisdiction, it provides no impediment to statutes, like § 46b-121, that determine the scope of jurisdiction.[30]

Giving effect to § 46b-121 does not " 'nullify' " any provision of the UCCJEA, as the concurring and dissenting justice suggests. See *State* v. *Victor O.*, 320 Conn. 239, 250, 128 A.3d 940 (2016) ("we must read statutes to avoid conflict that would result in a nullification of one by the other" (internal quotation marks omitted)). The UCCJEA's operation is unimpeded in almost every case within its purview. Our interpretation simply precludes that act's application in a discrete and rarely arising circumstance that undoubtedly was not contemplated when the act was drafted. If this result is not what our legislature intended, it is free to repeal § 46b-121 or expressly designate that its territorial limitation is inapplicable when Connecticut otherwise meets the jurisdictional requirements of the UCCJEA.

Nor can we say that it was irrational for the legislature to have maintained this requirement. Neglect proceedings are materially different from traditional custody

---

[30] A different type of territorial limitation commonly operates in the proceeding at which most initial child custody determinations are made. In a marriage dissolution action, in which an initial custody determination most commonly is made; see General Statutes § 46b-115q (d) (allowing court to decline to exercise jurisdiction over initial custody determination incidental to dissolution action while retaining jurisdiction over dissolution); it has long been the law in nearly every state, including Connecticut, that the party filing for dissolution must reside in the state in which the action is filed. See, e.g., *Rose* v. *Rose*, 96 Mass. App. 557, 561–62, 136 N.E.3d 408 (2019) ("Nearly every [s]tate . . . imposes a statutory durational residency requirement to ensure 'that those who seek a divorce from its courts [are] genuinely attached to the [s]tate,' and 'to insulate [its] divorce decrees from the likelihood of collateral attack.' *Sosna* v. *Iowa*, 419 U.S. 393, 404–405, 409, 95 S. Ct. 553, 42 L. Ed. 2d 532 (1975)."); see also, e.g., General Statutes § 46b-44 (residency requirement).

In re Teagan K.-O.

disputes between parents, in substance and procedure. A state child protection agency or its commissioner is the opposing party in a neglect proceeding. That proceeding typically does not end with a determination of custody in favor of one party or the other. It often results in substantial conditions being imposed on the parents in order to regain custody. It also may establish the predicate for termination of parental rights. It makes eminent sense for the child, personally or through her parent, to have a present connection with the state if an agency of that state is going to oversee the provision, and evaluate the success, of the services necessary to achieve family reunification.[31]

[31] That such a connection is required is consistent with the historical treatment of custody jurisdiction and the UCCJEA's disclaimer that neither the physical presence of, nor personal jurisdiction over, the child or "a party" is necessary. See General Statutes § 46b-115k (c). For many years prior to the enactment of the UCCJA, the rule was that "[a] state has power to exercise judicial jurisdiction to determine the custody . . . of the person of a child . . . (a) who is domiciled in the state [a fact dictated by a parent's domicile], or (b) who is present in the state, or (c) who is neither domiciled nor present in the state, if the controversy is between two or more persons who are personally subject to the jurisdiction of the state." 1 Restatement (Second), Conflict of Laws § 79, p. 237 (1971). The first ground was based on the theory that custody is a determination of status; see id., comment (a), p. 237; which is the theory cited in the commentary to the UCCJA as the rationale for the disclaimer regarding physical presence and personal jurisdiction. See footnote 20 of this opinion. Under this status theory, each state has jurisdiction to "determine the civil status and capacities of all its inhabitants," and even if an involved nonresident party could not be served within the state, the decree would be binding within the state in which it was rendered. *Pennoyer* v. *Neff*, 95 U.S. 714, 734–35, 24 L. Ed. 565 (1878), overruled in part on other grounds by *Shaffer* v. *Heitner*, 433 U.S. 186, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977); see also *In re Termination of Parental Rights to Thomas J.R.*, 262 Wis. 2d 217, 236, 663 N.W.2d 734 (2003) ("child custody proceedings determine the 'status' of children . . . [and thereby] implicate 'the right and obligation of the state in its parens patriae role to consider the welfare of the child subject to its jurisdiction and to make a determination that is in the best interests of the child' "). Thus, the status theory is predicated on the presence of the child or a parent, but not both parents. See *In re R.W.*, supra, 191 Vt. 125–29 (applying UCCJEA and citing status cases from other jurisdictions in support of conclusion that Vermont had jurisdiction to terminate father's parental rights, even though father lacked minimum contacts with Vermont, because court had jurisdiction to adjudicate custody "status" of his children, who, along with their mother, were within court's jurisdiction).

In re Teagan K.-O.

Nonetheless, the commissioner contends that giving effect to the territorial limitation will impede the operation of the UCCJEA, which our legislature could not have intended. She points to the following hypothetical to illustrate this point: Florida lacks home state or significant connection jurisdiction, but Connecticut has significant connection jurisdiction under the UCCJEA. The commissioner argues that, if we were to conclude that the territorial limitation applicable to neglect proceedings prevents Connecticut from exercising jurisdiction, no state would have jurisdiction over the matter. She points out that the UCCJEA permits a state to exercise default jurisdiction only when no other state has jurisdiction under one of the designated grounds. See General Statutes § 46b-115k (a) (6).

We disagree with the commissioner's concern for a couple of reasons. First, if the territorial limitations under § 46b-121 are not met, Connecticut would not have significant connection jurisdiction. We have found no case in which significant connection jurisdiction was found to exist in a case of predictive neglect in the absence of evidence that at least one parent maintained his or her domicile in the state exercising jurisdiction.[32]

[32] See *H.T.* v. *Cleburne County Dept. of Human Resources*, 163 So. 3d 1054, 1066–67 (Ala. Civ. App. 2014) (Alabama had significant connection jurisdiction over termination petition pertaining to infant born in Georgia, even though mother had been living in Georgia immediately before child's birth, because mother repeatedly used Alabama address as her residence on official forms and insisted to Department of Human Resources that she intended to live at that address with infant after leaving hospital); *In re Iliana M.*, 134 Conn. App. 382, 391–93, 38 A.3d 130 (2012) (Connecticut had significant connection jurisdiction over neglect petition relating to infant born in Massachusetts hospital because trial court did not credit parents' representations that they intended to live in Massachusetts given that they were longtime residents of Connecticut, they had listed Connecticut as their residence on hospital forms, and court filings and recent police reports listed Connecticut as their residence); *In re J.S.*, 131 N.E.3d 1263, 1264–65, 1271 (Ill. App. 2019) (Illinois had significant connection jurisdiction over neglect petition relating to infant born in Indiana hospital because mother claimed that she was planning move to Arizona and her hospital record noted that mother "has Illinois Medicaid, Illinois food stamps, and Illinois [Women, Infants and Children benefits]" (internal quotation marks omitted)); *In re Arnold*, 532 S.W.3d 712, 718 (Mo. App. 2017) (Missouri had significant connection jurisdiction over neglect petition pertaining to infant

In re Teagan K.-O.

born in Kansas because parents lived in Missouri during time relevant to cases pertaining to infant's siblings, parents' last known address is in Missouri, and parents declined to provide court with Kansas address despite claiming that they presently lived in that state); *State ex rel. R.P.* v. *Rosen*, supra, 966 S.W.2d 301 (Missouri had significant connection jurisdiction over neglect petition relating to infant born in Kansas hospital because parents had been living in Missouri for considerable period of time prior to child's birth, they indicated to social worker at Kansas hospital that they intended to return to Missouri with baby, and Missouri Medicaid paid for expenses associated with infant's birth); *State ex rel. W.D.* v. *Drake*, 770 P.2d 1011, 1012–13 (Utah App.) (California had significant connection jurisdiction over neglect petition relating to infant born in Utah because parents were longtime California residents, father stayed behind in California while mother looked for state with more favorable custody law, and mother took few belongings and did not establish permanent residence), cert. denied sub nom. *In re W.D.*, 789 P.2d 33 (Utah 1989); *In re M.S.*, 205 Vt. 429, 439–41, 176 A.3d 1124 (2017) (Vermont had significant connection jurisdiction over neglect petition relating to infant born in New Hampshire because parents lived for extended period in Vermont and occasionally lived in New Hampshire but did not establish their own residence in New Hampshire); *In re D.T.*, 170 Vt. 148, 150, 153, 743 A.2d 1077 (1999) (Vermont had significant connection jurisdiction over neglect petition relating to infant born in Massachusetts because child was taken to Vermont when he was two months old and parents stipulated that they intended to remain in Vermont).

Despite the absence of this factor in the present case, the concurring and dissenting justice nonetheless concludes that Connecticut has significant connection jurisdiction. It reads the case law as indicating that "proof of the following factors will support a conclusion that an infant has a significant connection to a forum state as a result of parental conduct: (1) history of long-term residency in that state by a parent; (2) the ongoing presence of the child's siblings in the state, especially if they are in the state's legal custody; (3) the presence of other relatives in the state; or (4) a state's provision of child welfare or other social services to the family." We disagree that the case law supports the concurring and dissenting justice's conclusion. With regard to the long-term residency of a parent in the state, if such residency has been relinquished at the time jurisdiction is invoked, the past residency could establish the parent's connection to the state, but it would not establish the connection of a child who has never been and will never be in the state. The statute unambiguously requires that "the child *and* at least one parent or person acting as a parent have a significant connection with this state . . . ." (Emphasis added.) General Statutes § 46b-115k (a) (3) and (4). With regard to the presence of the child's relatives in the state, we are unaware of any case in which this factor was cited without evidence demonstrating that the child voluntarily had maintained, or would be maintaining, a relationship with those relatives. With regard to the state's provision of services or benefits, the cases cited previously in this footnote suggest that there was a present entitlement to the services or benefits, or at least that such services or benefits had been received shortly before the child's birth and had not yet been terminated. It is reasonable to presume that a parent presently entitled to such services or benefits has not relinquished residency in the state. That is not the case here. Finally, with regard to the ongoing presence of the child's siblings in the state, especially if they are in the state's legal custody, we are unaware of any case in which this factor

That fact would be a sufficient basis for the child to be deemed neglected within this state under a theory of predictive neglect. Second, even if the present facts were sufficient to support Connecticut's significant connection jurisdiction, Florida would be permitted to exercise jurisdiction under the UCCJEA's temporary emergency jurisdiction provision, General Statutes § 46b-115n. Under that provision, Florida's order would remain in effect until the court of another state having jurisdiction issues a custody order. See General Statutes § 46b-115n (b) and (c). Because Connecticut lacks jurisdiction to do so, Florida would be free to issue orders that are more permanent.

The allegations in the present case do not satisfy the jurisdictional predicate of the juvenile matters provision. See General Statutes § 46b-121 (a) (1). There is no allegation from which we reasonably could infer that Teagan likely would be neglected within this state. She is present in this state only because of another state's action to remove her from her parents' state of residence. Jurisdiction to make an original custody determination rests with the state of Florida.[33]

The denial of the father's motion to dismiss is reversed and the case is remanded with direction to grant the motion.

In this opinion D'AURIA, KAHN and ECKER, Js., concurred.

alone was sufficient to establish a significant connection between the child and the state, especially when there is no evidence that the child has been or will be present in the state.

[33] Our conclusion that the trial court lacks jurisdiction over the commissioner's neglect petition has no effect on the order granting the commissioner temporary custody of Teagan. The father did not challenge that order, and Teagan's presence in this state is sufficient to establish a basis for temporary emergency custody. Teagan has resided with her sibling's foster family since the Connecticut trial court issued the order placing her in the commissioner's temporary custody. It is significant to note that our decision is limited to the question of whether Connecticut had jurisdiction to make a final custody decision at the time the custody proceeding was commenced. We have no occasion, in this appeal, to consider whether the UCCJEA would provide another mechanism by which such a temporary order could become a final

In re Teagan K.-O.

ROBINSON, C. J., with whom PALMER and MUL-
LINS, Js., join, concurring in part and dissenting in
part. A variety of mental health, domestic violence, and
parenting issues has necessitated the involvement of
the Department of Children and Families (department)
with the families of the respondents, Gary O. (father)
and Cassandra D. (mother),[1] since their own childhoods.
When the respondents became parents themselves, those
continued difficulties resulted in the department's suc-
cessfully petitioning to terminate their parental rights
to their two older children, first G and later J. While
the neglect and termination proceedings were pending
as to J, and the mother was pregnant with the minor
child, Teagan K.-O., the respondents paid a relative to
drive them to Florida in order to start a new life there
and to evade the department's anticipated removal of
Teagan upon her birth. Their plans, however, were
foiled when a Florida child welfare agency took custody
of Teagan upon her birth, and a Florida court exercised
its jurisdiction under certain court rules implementing
Florida's version of the Uniform Child Custody Juris-
diction and Enforcement Act (UCCJEA) and deemed
Connecticut's courts a more appropriate forum for pro-
ceedings concerning Teagan's welfare, given the then
pending proceedings in Connecticut concerning J. Our
trial court assented to the Florida decision when it agreed
to assume jurisdiction over the predictive neglect[2] peti-

custody determination under the facts of this case; see General Statutes
§ 46b-115n (b) and (c); or whether Teagan could remain in the care of her
sibling's foster family even if the issue of a final custody determination is
made by a Florida court. See General Statutes § 17a-175 (Interstate Compact
on the Placement of Children); Fla. Stat. Ann. § 409.408 et seq. (West 2018)
(Interstate Compact for the Placement of Children). Should either of those
issues, or any other, arise hereafter, they will be addressed in the first
instance by a Connecticut court.

[1] The mother is not participating in this appeal. Accordingly, all references
herein to the respondent are to the father.

[2] "[T]he [petitioner in a neglect proceeding], pursuant to [General Statutes
§ 46b-120], need not wait until a child is actually harmed before intervening
to protect that child. . . . This statute clearly contemplates a situation [in
which] harm could occur but has not actually occurred. Our statutes clearly

In re Teagan K.-O.

tion brought by the petitioner, the Commissioner of
Children and Families.

I respectfully disagree with part II of the majority
opinion, in which the majority concludes that the trial
court lacks subject matter jurisdiction over this case
as a result of our state's statutes governing the Superior
Court's jurisdiction over juvenile matters, in particu-
lar General Statutes §§ 46b-1 (11) and 46b-121 (a) (1),
which, together, give our Superior Court "jurisdiction"
over "proceedings concerning uncared-for, neglected
or abused children *within this state* . . . ."[3] (Emphasis

and explicitly recognize the state's authority to act before harm occurs to
protect children whose health and welfare *may* be adversely affected and
not just children whose welfare has been affected. . . . The doctrine of
predictive neglect is grounded in the state's responsibility to avoid harm to
the well-being of a child, not to repair it after a tragedy has occurred. . . .
Thus, [a] finding of neglect is not necessarily predicated on actual harm,
but can exist when there is a potential risk of neglect." (Emphasis in original;
internal quotation marks omitted.) *In re Joseph W.*, 305 Conn. 633, 644–45,
46 A.3d 59 (2012). To establish a case of predictive neglect under § 46b-120,
"the trial court must find that it is more likely than not that, if the child
remained in the current situation, the child would be denied proper care
and attention, physically, educationally, emotionally or morally . . . or
would be permitted to live under conditions, circumstances or associations
injurious to the well-being of the child or youth . . . ." (Citation omitted;
internal quotation marks omitted.) Id., 646.

[3] General Statutes § 46b-1 provides: "Matters within the jurisdiction of the
Superior Court deemed to be family relations matters shall be matters
affecting or involving: (1) Dissolution of marriage, contested and uncon-
tested, except dissolution upon conviction of crime as provided in section
46b-47; (2) legal separation; (3) annulment of marriage; (4) alimony, support,
custody and change of name incident to dissolution of marriage, legal separa-
tion and annulment; (5) actions brought under section 46b-15; (6) complaints
for change of name; (7) civil support obligations; (8) habeas corpus and
other proceedings to determine the custody and visitation of children; (9)
habeas corpus brought by or on behalf of any mentally ill person except a
person charged with a criminal offense; (10) appointment of a commission
to inquire whether a person is wrongfully confined as provided by section
17a-523; (11) *juvenile matters as provided in section 46b-121*; (12) all rights
and remedies provided for in chapter 815j; (13) the establishing of paternity;
(14) appeals from probate concerning: (A) Adoption or termination of paren-
tal rights; (B) appointment and removal of guardians; (C) custody of a minor
child; (D) appointment and removal of conservators; (E) orders for custody

In re Teagan K.-O.

added.) General Statutes § 46b-121 (a) (1). The majority rejects the petitioner's reliance on Connecticut's version of the UCCJEA, General Statutes § 46b-115 et seq., and holds that "the failure to satisfy § 46b-121 prevents Connecticut from exercising jurisdiction over the neglect petition, irrespective of whether the conditions for exercising jurisdiction under the UCCJEA would be met." Specifically, the majority concludes that, "[b]ecause the UCCJEA does not confer subject matter jurisdiction on our courts but instead determines whether our courts may exercise existing jurisdiction or must defer to another state's jurisdiction, it provides no impediment to statutes, like § 46b-121, that determine the scope of jurisdiction." In my view, the majority's interpretation

of any child; and (F) orders of commitment of persons to public and private institutions and to other appropriate facilities as provided by statute; (15) actions related to prenuptial and separation agreements and to matrimonial and civil union decrees of a foreign jurisdiction; (16) dissolution, legal separation or annulment of a civil union performed in a foreign jurisdiction; (17) custody proceedings brought under the provisions of chapter 815p; and (18) all such other matters within the jurisdiction of the Superior Court concerning children or family relations as may be determined by the judges of said court." (Emphasis added.)

General Statutes § 46b-121 provides in relevant part: "(a) (1) Juvenile matters in the civil session include *all proceedings concerning uncared-for, neglected or abused children within this state*, termination of parental rights of children committed to a state agency, adoption proceedings pursuant to section 46b-129b, matters concerning families with service needs, contested matters involving termination of parental rights or removal of guardian transferred from the Probate Court and the emancipation of minors, but does not include matters of guardianship and adoption or matters affecting property rights of any child over which the Probate Court has jurisdiction, except that appeals from probate concerning adoption, termination of parental rights and removal of a parent as guardian shall be included.

\* \* \*

"(b) (1) In juvenile matters, the Superior Court shall have authority to make and enforce such orders directed to parents, including any person who acknowledges before the court paternity of a child born out of wedlock, guardians, custodians or other adult persons owing some legal duty to a child therein, as the court deems necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child subject to the court's jurisdiction or otherwise committed to or in the custody of the Commissioner of Children and Families. . . ." (Emphasis added.)

of our statutes is inconsistent with the text of the relevant statutes, when read in context, and frustrates the purposes of the UCCJEA, which include avoiding interjurisdictional conflict and ensuring that child custody cases are heard in the forum best situated to decide the case. Instead, I conclude that, under subdivision (17) of § 46b-1, the UCCJEA, specifically General Statutes § 46b-115k,[4] provides an independent and coordinate basis for our Superior Court's subject matter jurisdiction in the specific instance of child custody and neglect cases of interstate dimension, regardless of the child's presence in Connecticut. This is consistent with

---

[4] General Statutes § 46b-115k provides: "(a) Except as otherwise provided in section 46b-115n, a court of this state has jurisdiction to make an initial child custody determination if:

"(1) This state is the home state of the child on the date of the commencement of the child custody proceeding;

"(2) This state was the home state of the child within six months of the commencement of the child custody proceeding, the child is absent from the state, and a parent or a person acting as a parent continues to reside in this state;

"(3) A court of another state does not have jurisdiction under subdivisions (1) or (2) of this subsection, the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships;

"(4) A court of another state which is the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under a provision substantially similar to section 46b-115q or section 46b-115r, the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships;

"(5) All courts having jurisdiction under subdivisions (1) to (4), inclusive, of this subsection have declined jurisdiction on the ground that a court of this state is the more appropriate forum to determine custody under a provision substantially similar to section 46b-115q or section 46b-115r; or

"(6) No court of any other state would have jurisdiction under subdivisions (1) to (5), inclusive, of this subsection.

"(b) Subsection (a) of this section is the exclusive jurisdictional basis for making a child custody determination by a court of this state.

"(c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination."

In re Teagan K.-O.

§ 46b-121 (a) (1), which merely describes our Superior Court's territorial jurisdiction over juvenile cases. I further conclude that Connecticut's courts have jurisdiction over Teagan under the "substantial connection" provisions of the UCCJEA. See General Statutes § 46b-115k (a) (3) and (4). Accordingly, I respectfully dissent in part.

I begin by noting my agreement with the majority's statement of the facts and procedural history of this case. I also agree with part I of the majority opinion, in which the majority concludes that the trial court's denial of the respondent's motion to dismiss is an appealable final judgment in the context of this case. Finally, I note that the jurisdictional issues in this case present a question of statutory interpretation, over which our review is plenary.[5] See, e.g., *Rutter* v. *Janis*, 334 Conn. 722, 730, 224 A.3d 525 (2020); see also General Statutes § 1-2z.

I

My analysis commences with whether Connecticut's courts lack subject matter jurisdiction over this case because Teagan was not "neglected . . . within this state," as required by § 46b-121 (a) (1). I agree with the petitioner's argument that § 46b-121 (a) (1) does not control the present case because that statute merely describes the Superior Court's territorial jurisdiction

---

[5] I note that, on December 4, 2019, we sua sponte ordered the parties to file "simultaneous supplemental briefs . . . addressing the following questions:

"If this court were to conclude that . . . § 46b-115k (a) (5) is not applicable to the present case because there is no basis to conclude that Florida exercised home state or significant connection jurisdiction:

"(1) Would Connecticut have significant connection jurisdiction under § 46b-115k (a) (3) of the [UCCJEA]?

"(2) If not, would Connecticut have default jurisdiction under § 46b-115k (a) (6)?

"(3) If Connecticut has either significant connection or default jurisdiction under the UCCJEA, would . . . §§ 46b-1 (11) and 46b-121 (a) (1), which limit jurisdiction over juvenile matters to a child 'neglected . . . within this state,' otherwise preclude the exercise of jurisdiction in the present case?"

and must be read consistently with related statutes conferring jurisdiction in custody and neglect cases, in particular the UCCJEA, which governs child custody cases with interstate implications and the provisions of which expressly contemplate a child not present in the state.

"Jurisdiction of the [subject matter] is the power [of a tribunal] to hear and determine cases of the general class to which the proceedings in question belong." (Internal quotation marks omitted.) *Castro* v. *Viera*, 207 Conn. 420, 427, 541 A.2d 1216 (1988); accord *In re Jose B.*, 303 Conn. 569, 579–80, 34 A.3d 975 (2012). Pursuant to § 1-2z, I begin with an overview of the text of the relevant statutory provisions governing our Superior Court's jurisdiction over neglect proceedings. Section 46b-1 provides an extensive list of those "[m]atters within the jurisdiction of the Superior Court [that are] deemed to be family relations matters . . . ." See footnote 3 of this opinion. Included in that list are "juvenile matters as provided in [§] 46b-121 . . . ." General Statutes § 46b-1 (11). Juvenile matters, as provided by § 46b-121, "include all proceedings concerning uncared-for, neglected or abused children *within this state* . . . ." (Emphasis added.) General Statutes § 46b-121 (a) (1); see also General Statutes § 46b-121 (a) (2) (A) (similarly defining juvenile matters in criminal session of Superior Court to include, inter alia, "all proceedings concerning delinquent children within this state"). Although § 46b-121 (a) (1) can reasonably[6] be read to require the minor child to have or have had some physical presence in Connecticut,[7] it is axiomatic that a statute is not read

[6] In my view, the majority's construction of §§ 46b-1 and 46b-121 (a) (1), and the UCCJEA, is reasonable, rendering those statutes ambiguous for purposes of the § 1-2z analysis. Accordingly, I consult extratextual sources to aid my determination of the legislature's intent. See, e.g., *Hynes* v. *Jones*, 331 Conn. 385, 393, 204 A.3d 1128 (2019).

[7] Although the phrase "within this state," as used in § 46b-121 (a) (1), has not previously been construed by our courts, whether it means that neglect of the child has occurred or likely will occur within this state, that the neglected child is present in this state, and/or that the child's domicile is in this state, it is undisputed that none of these conditions exists.

In re Teagan K.-O.

in insolation but must be considered in the context of related statutes. See, e.g., *State* v. *Victor O.*, 320 Conn. 239, 248–49, 128 A.3d 940 (2016). Thus, it is significant that subsection (17) of § 46b-1 expressly provides that another family relations matter within the Superior Court's jurisdiction is one "affecting or involving . . . custody proceedings brought under the provisions of chapter 815p," namely, the UCCJEA.

Accordingly, I turn to the UCCJEA, which, in relevant part, broadly defines a "child custody proceeding" to "[mean] a proceeding in which legal custody, physical custody or visitation with respect to a child is an issue," including "a proceeding for . . . neglect, abuse, dependency . . . [and] termination of parental rights . . . in which the issue may appear. . . ." General Statutes § 46b-115a (4). The UCCJEA addresses jurisdiction in custody situations of interstate dimension by authorizing the Superior Court to exercise jurisdiction if

- Connecticut is the child's "home state";[8] General Statutes § 46b-115k (a) (1) and (2);

- there is no home state or the home state has declined jurisdiction on inconvenient forum grounds, and the child and at least one parent have a significant connection with this state; General Statutes § 46b-115k (a) (3) and (4);

- all home state and significant connection states have declined to exercise jurisdiction on the ground that this state would be a more appropriate forum

---

[8] The UCCJEA defines the "home state," in relevant part, as "the state in which a child lived with a parent or person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months old, the term means the state in which the child lived from birth with any such parent or person acting as a parent. . . ." General Statutes § 46b-115a (7). I note that "cases in other states have concluded [that] time spent in a forum after the filing of a child custody petition may not be counted [toward] the time necessary for home state jurisdiction." *In re Marriage of Sareen*, 153 Cal. App. 4th 371, 379, 62 Cal. Rptr. 3d 687 (2007), cert. denied sub nom. *Sareen* v. *Sareen*, 552 U.S. 1259, 128 S. Ct. 1670, 170 L. Ed. 2d 357 (2008).

under an inconvenient forum analysis; General
Statutes § 46b-115k (a) (5); or

* no court of any other state would have jurisdiction
  under the foregoing grounds. General Statutes
  § 46b-115k (a) (6).

For convenience, these jurisdictional bases are com-
monly known as home state jurisdiction, significant
connection jurisdiction, more appropriate forum juris-
diction, and default or vacuum jurisdiction, respec-
tively.[9] See P. Hoff, Office of Juvenile Justice and Delin-

---

[9] Although the commentary to the UCCJEA specifically characterizes the
jurisdictional provisions as conferring "subject matter jurisdiction"; Unif.
Child Custody Jurisdiction Enforcement Act (1997) § 201, comment (2), 9
U.L.A. (Pt. IA) 505 (2019); some courts and commentators disagree with
that characterization of the UCCJEA and its predecessor, the Uniform Child
Custody Jurisdiction Act (predecessor act), instead viewing them as (1)
governing personal jurisdiction; see, e.g., *Harris* v. *Young*, 473 N.W.2d 141,
143 (S.D. 1991) (predecessor act); B. Atwood, "Child Custody Jurisdiction
and Territoriality," 52 Ohio St. L.J. 369, 375 (1991) (citing disagreement
among commentators and courts under predecessor act); see also 750 Ill.
Comp. Stat. Ann. 60/208 (West 2019) (referring to UCCJEA as prescribing
personal jurisdiction); (2) pertaining to venue; see, e.g., *In re Custody of
A.C.*, 165 Wn. 2d 568, 573 n.3, 200 P.3d 689 (2009) (noting that it would have
been more appropriate for UCCJEA to refer to "exclusive venue" instead
of "subject matter jurisdiction," but using latter term for consistency); see
also, e.g., *Friedman* v. *Eighth Judicial District Court ex rel. Clark*, 127
Nev. 842, 848 n.5, 264 P.3d 1161 (2011) (same); or (3) as a procedural limit
on the court's authority, which also may be waivable. See *In re J.S.*, 131
N.E.3d 1263, 1267–68 (Ill. App. 2019) ("[W]hile the UCCJEA uses the term
jurisdiction to describe conditions that must be met before an Illinois court
can decide a question of initial child custody, jurisdiction here does not
mean a precondition to the exercise of the court's inherent authority. . . .
Rather, jurisdiction under the UCCJEA is simply a procedural limit on when
the court may hear initial custody matters. . . . To define the term more
broadly would conflict with [well established] law holding that the [trial]
court has the authority, pursuant to our constitution, to consider all justicia-
ble matters that do not fall within the original and exclusive jurisdiction of
[the Illinois] [S]upreme [C]ourt." (Citations omitted; internal quotation marks
omitted.)); *Williams* v. *Williams*, 555 N.E.2d 142, 145 (Ind. 1990) (pred-
ecessor act). I suggest, however, that it is difficult to square the characteriza-
tion of the UCCJEA as relating to personal jurisdiction with the UCCJEA
provision expressly stating that personal jurisdiction is not necessary. See
General Statutes § 46b-115k (c).

In re Teagan K.-O.

quency Prevention, Office of Justice Programs, "The Uniform Child-Custody Jurisdiction and Enforcement Act," Juv. Just. Bull., December, 2001, p. 5–6, available at http://www.ncjrs.gov/pdffiles1/ojjdp/189181.pdf (last visited June 23, 2020).

Our legislature adopted the UCCJEA in 1999. See Public Acts 1999, No. 99-185. It replaced a similar scheme adopted in 1978 known as the Uniform Child Custody Jurisdiction Act (predecessor act). See Public Acts 1978, No. 78-318; see also Public Acts 1999, No. 99-185, § 39 (repealing General Statutes §§ 46b-90 through 46b-114). The UCCJEA was intended to "(1) [*a*]*void jurisdictional competition and conflict with courts of other* [*s*]*tates in matters of child custody which have in the past resulted in the shifting of children from* [*s*]*tate to* [*s*]*tate with harmful effects on their well-being*; (2) [*p*]*romote cooperation with the courts of other* [*s*]*tates to the end that a custody decree is rendered in that* [*s*]*tate which can best decide the case in the interest of the child*; (3) [*d*]*iscourage the use of the interstate system for continuing controversies over child custody*; (4) [d]eter abductions of children; (5) [a]void relitigation of custody decisions of other [s]tates in this [s]tate; [and] (6) [f]acilitate the enforcement of custody decrees of other [s]tates . . . ." (Emphasis added.) Unif. Child Custody Jurisdiction Enforcement Act (1997) § 101, comment, 9 U.L.A. (Pt. IA) 474 (2019); see, e.g., *In re Iliana M.*, 134 Conn. App. 382, 390, 38 A.3d 130 (2012).

Conflicting custody orders and the enforcement of orders had been a problem under the predecessor act to the UCCJEA in part because there was some question as to whether custody orders fell outside the purview of the full faith and credit clause of the United States constitution; U.S. Const., art. IV, § 1; and the predecessor act did not eliminate the possibility of the courts of multiple states having concurrent jurisdiction and entering competing custody orders. See P. Hoff, supra,

pp. 2–3; see also 1 Restatement (Second), Conflict of Laws § 79, comment (c) and reporter's note to comment (c), pp. 238–39, 241 (1971). This encouraged noncustodial parents to continue to use their children to forum shop for more favorable custody arrangements. See, e.g., *Bellew* v. *Larese*, 288 Ga. 495, 499, 706 S.E.2d 78 (2011); In re *Felty* v. *Felty*, 66 App. Div. 3d 64, 71–72, 882 N.Y.S.2d 504 (2009); P. Hoff, supra, p. 2. To avoid the interjurisdictional conflict that had occurred under the predecessor act, the UCCJEA prioritizes jurisdiction over an initial custody determination by the state having the presumed closest connection to the child, with the highest priority given to the child's home state. See, e.g., *In re A.A.-F.*, 310 Kan. 125, 136, 444 P.3d 938 (2019); *Stephens* v. *Fourth Judicial District Court*, 331 Mont. 40, 44, 128 P.3d 1026 (2006); *Powell* v. *Stover*, 165 S.W.3d 322, 325 (Tex. 2005); see also Unif. Child Custody Jurisdiction Enforcement Act (1997) prefatory note, supra, 9 U.L.A. (Pt. IA) 461 (noting that prioritization of home state harmonized UCCJEA with federal Parental Kidnapping Prevention Act (PKPA), 28 U.S.C. § 1738A); P. Hoff, supra, p. 5 (noting that UCCJEA's rejection of "the [predecessor act's] coequal treatment of home [s]tate and significant connection jurisdiction" was "intended to significantly reduce the number of situations in which more than one [s]tate has jurisdiction over a [child custody] matter" and to conform to PKPA).

In my view, the majority's conclusion that our Superior Court lacks jurisdiction because Teagan was not present "within this state," as contemplated by § 46b-121 (a) (1), fails to see the statutory forest through the trees. First, subdivision (17) of § 46b-1 contemplates proceedings under the UCCJEA as equally within the jurisdiction of the Superior Court as subdivision (11) of that statute, which refers to juvenile matters under § 46b-121. Thus, it is significant that the UCCJEA specifically contemplates an interstate child custody dispute and expressly disclaims the necessity of physical pres-

335 Conn. 745 DECEMBER, 2020 797

In re Teagan K.-O.

ence, in contrast to the more general § 46b-121 (a) (1), as § 46b-115k (c) provides: "Physical presence of, or personal jurisdiction over, a party or a child *is not necessary* or sufficient to make a child custody determination."[10] (Emphasis added.) The UCCJEA also states expressly that "[s]ubsection (a) [of § 46b-115k] is the *exclusive* jurisdictional basis for making a child custody determination by a court of this state." (Emphasis added.) General Statutes § 46b-115k (b).

This exclusivity language is particularly significant in light of the dispensation of physical presence or personal jurisdiction, given that the legislature adopted the UCCJEA subsequent to § 46b-121 (a) (1) and the "principle of legislative consistency [that] is vital to our consideration of the subject statute's relationship to existing legislation . . . governing the same subject matter . . . . [T]he legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader

[10] Indeed, when the UCCJEA contemplates jurisdiction depending on the presence of the minor child in the state, it says so specifically in its temporary emergency jurisdiction provision, codified at General Statutes § 46b-115n, which is significant because, "[w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed." (Internal quotation marks omitted.) *Valliere* v. *Commissioner of Social Services*, 328 Conn. 294, 314, 178 A.3d 346 (2018); see General Statutes § 46b-115n (a) ("[a] court of this state has temporary emergency jurisdiction if the child is present in this state and (1) the child has been abandoned, or (2) it is necessary in an emergency to protect the child because the child, a sibling or a parent has been, or is under a threat of being, abused or mistreated").

For a helpful explanation of the relationship between home state and temporary emergency jurisdiction, in particular when a court's temporary jurisdiction may transition to a permanent basis for jurisdiction under the UCCJEA, see the Vermont Supreme Court's recent decision in *In re M.P.*, 219 A.3d 1315, 1322–23 (Vt. 2019).

In re Teagan K.-O.

statutory scheme to ensure the coherency of our construction. . . . [T]he General Assembly is always presumed to know all the existing statutes and the effect that its action or [nonaction] will have upon any one of them." (Citation omitted; internal quotation marks omitted.) *Sokaitis* v. *Bakaysa*, 293 Conn. 17, 23, 975 A.2d 51 (2009). Thus, "we must read statutes to avoid conflict that would result in a nullification of one by the other . . . ." (Internal quotation marks omitted.) *State* v. *Victor O.*, supra, 320 Conn. 250; see id., 250–51 (rejecting interpretation of statute to require special parole in all cases that would "effectively nullify" portion of statute "authorizing probation in some of those cases"); *Sokaitis* v. *Bakaysa*, supra, 23–24 (rejecting "literal reading" of General Statutes § 52-553 voiding "[a]ll . . . wagers" that "results in several conflicts with other, more recent, statutes related to legal wagering" (internal quotation marks omitted)).

Given our Superior Court's unquestioned competence to decide neglect cases as a class of matters; see, e.g., *Castro* v. *Viera*, supra, 207 Conn. 427; I conclude that § 46b-121 (a) (1) may easily be reconciled with the UCCJEA.[11] The genealogy and history of § 46b-121 render it apparent that the "within this state" limitation of § 46b-121 (a) (1) is merely a statement of the Superior Court's statewide *territorial* jurisdiction, which is a term that "refers to the connection between the territorial authority of the court and the action that has been brought before the court. . . . Under modern law . . . the basis of territorial jurisdiction has come to be

---

[11] Even without reconciliation, I note that, as the later enacted statute, the UCCJEA's directive must control over § 46b-121, to the extent that they are in irreconcilable conflict. See *Bouley* v. *Norwich*, 222 Conn. 744, 758–59, 610 A.2d 1245 (1992) ("[E]nactments by the General Assembly are presumed to repeal earlier inconsistent ones to the extent that they are in conflict. . . . Because repeal by implication is generally disfavored, however, the principle applies only when the relevant statutes cannot stand together." (Citation omitted; internal quotation marks omitted.)). Reliance on this rule of construction is particularly apt when the later enacted provision is part of a uniform act like the UCCJEA.

defined primarily in terms of relationship between the
place where the transaction in question occurred
(including the place of residence of the parties to the
transaction) and the territory of the state or nation in
which the action is brought.''[12] (Citation omitted; inter-
nal quotation marks omitted.) *Trichilo* v. *Trichilo*, 190
Conn. 774, 779–80 n.7, 462 A.2d 1048 (1983), quoting
1 Restatement (Second), Judgments c. 2, introductory
note, and § 4 comment (a), pp. 22, 56 (1982); see *Trich-
ilo* v. *Trichilo*, supra, 780 ("[t]he complaint, by virtue of

---

[12] The Restatement (Second) of Judgments provides a concise explanation
of the concept of territorial jurisdiction. "Courts are constituted by govern-
ments, including national governments within the international community
and state governments within our federal union. The governments them-
selves have an authority that for most purposes is defined by reference to
their legal boundaries or territorial limits. Hence, the courts constituted by
them have an authority that is correspondingly defined, at least in part, in
territorial terms.

"Historically, the territorial jurisdiction of courts was based upon the
presence of a person or thing within the legal boundaries of the government
that created the court. . . . When a person was within those boundaries,
jurisdiction described as 'in personam' could be exercised over him; when
a thing was within those boundaries, jurisdiction described as 'in rem' or
'quasi in rem' could be exercised to determine interests in the thing.

"Presence of the person or thing remains of significance in the law of
territorial jurisdiction. Generally speaking, it remains the rule that enforce-
ment of a judgment may be effectuated only by executive officials (such as
the sheriff or marshal) of the government in which the enforcement is
undertaken. Hence, outside the territorial limits of a court's jurisdiction,
the coercive effectiveness of its judgment depends upon the judgment's
being given recognition by the authorities of another government, under a
principle of comity or by virtue of legal provisions such as the [f]ull [f]aith
and [c]redit [c]lause of the [United States] [c]onstitution. This means that
a court's judgment even though final is not of its own legal authority the
last word in providing legal redress outside its territorial limits. Correlatively,
the practical effectiveness of a judgment against someone or something
outside the court's territorial jurisdiction depends upon cooperation of
another government." (Citation omitted.) 1 Restatement (Second), Judg-
ments c. 2, introductory note, pp. 22–23 (1982); see also *Pennoyer* v. *Neff*,
95 U.S. 714, 722, 24 L. Ed. 565 (1878) ("The several [s]tates are of equal
dignity and authority, and the independence of one implies the exclusion
of power from all others. And so it is laid down by jurists, as an elementary
principle, that the laws of one [s]tate have no operation outside of its
territory, except so far as is allowed by comity; and that no tribunal estab-
lished by it can extend its process beyond that territory so as to subject
either persons or property to its decisions.").

In re Teagan K.-O.

the statutory presumption of agency necessarily implied by the allegation that the defendant owned one of the cars involved in the accident, set forth a sufficient relationship between this state and the defendant . . . to support the exercise of its territorial jurisdiction over him in this action'').

The history and genealogy of § 46b-121 indicate that the phrase ''within this state'' is a statement of territorial jurisdiction. Some version of ''within this state'' has been included in the statute, now codified at § 46b-121 (a) (1), since 1921. See Public Acts 1921, c. 336, § 3 (P.A. 21-336); General Statutes (Supp. 1943) § 380g; Public Acts 1976, No. 76-436, § 14. It originated when a system of juvenile courts was created to adjudicate matters such as neglect and dependency; P.A. 21-336, § 2; and the jurisdiction of those local courts was limited to their respective territorial limits. See P.A. 21-336, § 3 (vesting ''several juvenile courts'' with exclusive original jurisdiction over proceedings concerning neglected children ''within the territory over which their respective jurisdictions extend''). When a unified juvenile court was created in 1943, the statute was amended to refer to the jurisdiction of juvenile courts over neglected and dependent children ''within its territorial limits . . . .'' General Statutes (Supp. 1943) § 380g. In 1976, the legislature enacted No. 76-436, § 14, of the 1976 Public Acts, which amended the statutory language to ''within this state,'' to reflect the transfer of the juvenile court's powers to the unified Superior Court with statewide jurisdiction. See General Statutes § 51-1a (b) (''[t]he territorial jurisdiction of the Supreme Court, the Appellate Court, and the Superior Court shall be coextensive with the boundaries of the state''); *Fort Trumbull Conservancy, LLC* v. *New London*, 282 Conn. 791, 818–20, 925 A.2d 292 (2007) (Superior Court is court of statewide general jurisdiction, with venue in specific judicial districts not subject matter jurisdictional in nature); see also *McDonald* v. *Hugo*, 93 Conn.

In re Teagan K.-O.

360, 363–66, 105 A. 709 (1919) (describing difference in territorial jurisdiction of Superior Court judicial district and former city courts).

Viewing § 46b-121 (a) (1) as a statement of the Superior Court's territorial jurisdiction[13] renders it readily reconcilable with potentially conflicting provisions of the UCCJEA that specifically dispense with the presence of the child as a basis for jurisdiction. This is because the Restatement (Second) of Judgments instructs us that, "[i]n the course of the last century, the significance of presence of person or thing as a basis of territorial jurisdiction has diminished. Courts are far readier than in the past to give recognition to judgments of sister jurisdictions without going behind them to reexamine the merits. . . .

"In this perspective, development of the modern law of territorial jurisdiction may be better comprehended. In *International Shoe Co.* v. *Washington*, 326 U.S. 310, [316] 66 S. Ct. 154, 90 L. Ed. 95 (1945), the [United States] Supreme Court held that presence is not necessary for the exercise of in personam jurisdiction, stating that

---

[13] The principal effect of characterizing a condition as an expression of territorial jurisdiction, rather than subject matter jurisdiction, is the possibility of the former being subject to waiver. See, e.g., *B.J.P.* v. *R.W.P.*, 637 A.2d 74, 78–79 (D.C. 1994) ("[t]he purported lack of subject matter jurisdiction based on territorial considerations—a fair characterization of the asserted defect here—has been held to be analytically similar to improper venue; it does not go to the power of the court to adjudicate the case, and may be waived if not asserted in [a] timely fashion" (emphasis omitted)); 1 Restatement (Second), Judgments, supra, c. 2, introductory note, p. 28 (distinguishing territorial jurisdiction on basis of waiver). But see *State* v. *Dudley*, 364 S.C. 578, 582, 614 S.E.2d 623 (2005) ("Although territorial jurisdiction is not a component of subject matter jurisdiction, we hold that it is a fundamental issue that may be raised by a party or by a court at any point in the proceeding. . . . The exercise of extraterritorial jurisdiction implicates the state's sovereignty, a question so elemental that we hold it cannot be waived by conduct or by consent." (Citation omitted; footnote omitted.)). Waiver is not at issue in the present case, however, because the respondent has consistently objected to the exercise of jurisdiction over the case given Teagan's lack of presence in this state.

In re Teagan K.-O.

the significant question was whether, in the context of our federal system of government, the defendant has minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'' (Internal quotation marks omitted.) 1 Restatement (Second), Judgments, supra, c. 2, introductory note, pp. 24–25; see also *Bristol-Myers Squibb Co.* v. *Superior Court*, U.S. , 137 S. Ct. 1773, 1780, 198 L. Ed. 2d 395 (2017) (restrictions on personal jurisdiction "are a consequence of territorial limitations on the power of the respective [s]tates'' (internal quotation marks omitted)).

"Apart from the [c]onstitutional requirement of minimum contacts, most states have established for themselves a limitation of comparable effect through the rule of forum non conveniens. . . . The minimum contacts rule and the rule of forum non conveniens express the same principle: *In general, a court should exercise jurisdiction over an action only if, considering the availability of other forums, the court is an appropriate locus for the adjudication.*'' (Citation omitted; emphasis added; internal quotation marks omitted.) 1 Restatement (Second), Judgments, supra, § 4, comment (a), p. 57.

The policies underlying the concept of territorial jurisdiction are directly addressed by the terms of the UCCJEA, the fundamental policy of which is to adjudicate the custody of a minor in the court with the most appropriate locus and connection to the case. The uniform acceptance of the UCCJEA ensures that a state's judgment as to custody will be recognized outside its territorial limits. See P. Hoff, supra, p. 5. Its rejection of the child's presence as a jurisdictional necessity is consistent with the modern law of territorial jurisdiction. The UCCJEA supplements minimum contacts, which would be established under home state or significant connection jurisdiction, with a comparable rule of inconvenient forum. See Unif. Child Custody Jurisdic-

In re Teagan K.-O.

tion Enforcement Act (1997) § 201, comment (2), supra, 9 U.L.A. (Pt. IA) 506 ("[N]either minimum contacts nor service within the [s]tate is required for the court to have jurisdiction to make a custody determination. . . . The requirements of this section, plus the notice and hearing provisions of the [UCCJEA], are all that is necessary to satisfy due process.").

Because a uniform act is at issue, I have also considered case law from other jurisdictions that have adopted the UCCJEA and have jurisdictional statutes comparable to § 46b-121 (a) (1).[14] See, e.g., *Studer* v. *Studer*, 320 Conn. 483, 489–91, 131 A.3d 240 (2016); *Friezo* v. *Friezo*, 281 Conn. 166, 187–88, 914 A.2d 533 (2007). I have not found any case squarely considering whether the UCCJEA affords an independent basis for finding jurisdiction over a child who is not present in a state that has a separate statute like § 46b-121 (a) (1) providing a general grant of jurisdiction over neglect proceedings

---

[14] I agree with the majority that a survey of statutes governing jurisdiction over neglect and dependency proceedings reveals that most states afford a general grant of jurisdiction over neglect proceedings without an express limitation relating to the child's connection to the state or relevant political subdivision, but there are several states that have statutes requiring such connections. See, e.g., Mich. Comp. Laws Serv. § 712A.2 (b) (LexisNexis Cum. Supp. 2019) ("juvenile under 18 years of age found within the county"); Mo. Ann. Stat. § 211.031 1. (1) (West 2017) ("any child who may be a resident of or found within the county"); Mont. Code Ann. § 41-3-103 (1) (a) (2019) ("a youth who is within the state of Montana for any purpose"); R.I. Gen. Laws § 14-1-5 (1) (Cum. Supp. 2019) ("any child residing or being within the state"). Some of these statutes expressly designate these limitations as matters of personal jurisdiction or venue. See Okla. Stat. Ann. tit. 10A, § 2-2-102 (A) (1) (West 2018) (personal jurisdiction exists "where a child . . . resides . . . is found, or . . . is alleged to be or is found to be in need of supervision"); W. Va. Code Ann. § 49-4-601 (a) (LexisNexis 2015) (venue is proper "in the county in which the child resides," "in the county in which the custodial respondent or other named party abuser resides, or in which the abuse or neglect occurred"); see also *In re Doe*, 83 Haw. 367, 373, 926 P.2d 1290 (1996) (characterizing Haw. Rev. Stat. § 587-11, which was repealed in 2010 and which provided that "the court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the [s]tate at the time the facts and circumstances occurred, are discovered, or are reported to the department," as matter of personal jurisdiction (internal quotation marks omitted)).

In re Teagan K.-O.

within the state.[15] The only case I have found that is

[15] The cases do not consider whether the UCCJEA provides a basis for jurisdiction independent of a potentially conflicting state statute but, instead, stand for the otherwise unremarkable proposition, relied on by the majority, that the UCCJEA may cabin a broader statutory grant of jurisdiction in cases of interstate dimension. See, e.g., *In re A.A.-F.*, supra, 310 Kan. 135 ("[T]he Revised Kansas Code for Care of Children generally confers original jurisdiction on Kansas courts to hold proceedings concerning any child who may be a child in need of care. . . . But the [l]egislature placed limits on this jurisdiction, making it '[s]ubject to the [UCCJEA].' " (Citations omitted.)); *Banerjee* v. *Banerjee*, 258 So. 3d 699, 701–702 (La. App. 2017) ("[e]ven if a Louisiana court has subject matter jurisdiction, that jurisdiction must be declined based on limitations imposed by the UCCJEA"); *DeLima* v. *Tsevi*, 301 Neb. 933, 937, 921 N.W.2d 89 (2018) ("[T]here are other statutes outside the UCCJEA that confer jurisdiction to decide child custody matters. . . . But while other statutes may confer jurisdiction generally, [Nebraska's statute] directs courts to determine whether jurisdiction exists over a specific child custody proceeding under the UCCJEA." (Citations omitted.)); see also *Rosen* v. *Celebrezze*, 117 Ohio St. 3d 241, 249, 883 N.E.2d 420 (2008) ("the mere fact that the Ohio court has basic statutory jurisdiction to determine custody matters in [legal separation] and divorce cases . . . does not preclude a more specific statute like [the UCCJEA] from patently and unambiguously divesting the court of such jurisdiction" (citations omitted)).

Other cases have similarly analyzed the question of jurisdiction under both the general jurisdictional statute and the UCCJEA, deeming that the exercise of jurisdiction must be proper under the terms of each. See *State ex rel. R.P.* v. *Rosen*, 966 S.W.2d 292, 297 (Mo. App. 1998) (applying predecessor act); *In re K.U.-S.G.*, 208 N.C. App. 128, 131–32, 702 S.E.2d 103 (2010) (considering general provision providing jurisdiction over child present in district and UCCJEA, because termination proceeding required North Carolina court to modify order issued by Pennsylvania court); cf. *Arizona Dept. of Economic Security* v. *Grant ex rel. Maricopa*, 232 Ariz. 576, 581–82, 307 P.3d 1003 (App. 2013) (determining that jurisdiction was proper under UCCJEA because neglected or abused child was found in state, even though jurisdiction was lacking under common law because alleged abuse occurred outside of state).

Finally, I note the decisions of two state courts that considered jurisdiction over proceedings to terminate parental rights, which also are subject to the UCCJEA, when a state statute vested exclusive original jurisdiction over a petition relating to termination of parental rights with respect to a child who had a specific presence in the state. Despite the child's lack of presence at the time the petition to terminate parental rights was filed, the courts held that jurisdiction existed under the UCCJEA because of its exclusive continuing jurisdiction provision, as the custodial guardians had resided in the state at the time an initial custody order had been issued. See *In re G. B.*, 167 N.H. 99, 102–105, 105 A.3d 615 (2014); *In re H.L.A.D.*, 184 N.C. App.

close to on point is an intermediate appellate court
decision from North Carolina, *In re Leonard*, 77 N.C.
App. 439, 335 S.E.2d 73 (1985), in which the court con-
cluded that the UCCJEA's predecessor act did not give
the North Carolina courts subject matter jurisdiction
over a petition to terminate parental rights to a child
when the petitioner, his mother, had taken him from
North Carolina to Ohio four days prior to the filing of
the petition, because of a North Carolina state statute
providing that "[t]he district court shall have exclusive
original jurisdiction to hear and determine any petition
relating to termination of parental rights to any child
who resides in, is found in, or is in the legal or actual
custody of a county department of social services or
licensed child-placing agency in the district at the time
of filing of the petition." (Internal quotation marks omit-
ted.) Id., 440–41; see also *In re D.D.J.*, 177 N.C. App.
441, 443, 628 S.E.2d 808 (2006) (considering presence
requirement under general jurisdictional statute with-
out mention of UCCJEA). I find *Leonard* to be inappo-
site, however, because it arose under the predecessor
act, which lacked the UCCJEA's language present in
§ 46b-115k (b) providing that it is the exclusive basis
for determining jurisdiction, with the North Carolina
state jurisdictional statute at issue having exclusivity
language that is absent from § 46b-121 (a) (1). See *In
re Leonard*, supra, 441 ("[t]he language of the [general
jurisdictional] statute is that it shall not be 'used to
circumvent' [the predecessor act], not that it shall 'be
in conformity with' [the predecessor act]"). Indeed, the
court acknowledged the "unfortunate" result of its
interpretation, which was specifically remedied by the
UCCJEA, stating that, "[t]hough residence or physical

381, 388–89, 646 S.E.2d 425 (2007), aff'd, 362 N.C. 170, 655 S.E.2d 712 (2008).
Accordingly, these cases do not provide guidance in the present case, which
raises the question of whether the UCCJEA affords our Superior Court
with jurisdiction to render an initial custody determination, rather than a
continuing one.

In re Teagan K.-O.

presence of the child in the district at the time of filing is some indication of the child's connections with the state, the requirement is too easily overcome by a visit to the district on the filing date.'' Id. Accordingly, I do not find *Leonard* persuasive, insofar as it arose under a distinct statutory scheme. Cf. *Thomas* v. *Avant*, 370 Ark. 377, 386, 260 S.W.3d 266 (2007) (state venue statute requiring action for custody of illegitimate child to be brought in county where child resides inapplicable to interstate custody dispute with child who no longer resides in Arkansas given ''the conflict between the state statute and the jurisdictional requirements of the UCCJEA and the PKPA''); *Feriole* v. *Feriole*, 468 So. 2d 1090, 1091 (Fla. App. 1985) (concluding that predecessor act provision that physical presence of child is not prerequisite for jurisdiction to determine custody superseded prior Florida common law under which court had no jurisdiction to adjudicate custody of minor child not physically present within territorial jurisdiction of court at time action was filed).

Finally, my interpretation of the Connecticut statutes is consistent with the purposes of the UCCJEA, which include avoiding the ''shifting of children from [s]tate to [s]tate with harmful effects on their well-being'' and ''[promoting] cooperation with the courts of other [s]tates to the end that a custody decree is rendered in that [s]tate which can best decide the case in the interest of the child . . . .'' Unif. Child Custody Jurisdiction Enforcement Act (1997) § 101, comment, supra, 9 U.L.A. (Pt. IA) 474. The respondents' story is not unique. I have found numerous cases with facts akin to this one, in which parents whose older children had previously been taken into the custody of state child protection agencies fled that state upon the imminent birth of another child in order to keep that newborn child from state custody. See, e.g., *In re Iliana M.*, supra, 134 Conn. App. 384–85; *In re J.S.*, 131 N.E.3d 1263, 1265 (Ill. App. 2019); *State ex rel. W.D.* v. *Drake*, 770 P.2d 1011, 1012

In re Teagan K.-O.

(Utah App.), cert. denied sub nom. *In re W.D.*, 789 P.2d 33 (Utah 1989). This tactic removes the child from any existing familial and social service networks that had been providing support to the family and thwarts the important role assigned to those child welfare agencies and courts with the greatest familiarity with the subject family. Adopting a construction of our statutes that countenances this tactic is in direct contradiction of the purpose of the UCCJEA. See, e.g., *Studer* v. *Studer*, supra, 320 Conn. 496 (rejecting construction of choice of law provision of Uniform Interstate Family Support Act, General Statutes § 46b-213q, that "would defeat one of the primary purposes underlying the uniform act, namely that of preventing forum shopping by the parties to a child support order," by moving to state with more favorable laws). Accordingly, I interpret §§ 46b-1 and 46b-121 (a) (1) in light of the UCCJEA, and conclude that Teagan's lack of presence in this state does not by itself deprive our Superior Court of subject matter jurisdiction over the neglect petition.

II

This brings me to whether Connecticut has jurisdiction over the present matter under the UCCJEA. Relying on the respondents' lengthy history of involvement with Connecticut's child welfare authorities and juvenile court, along with contemporaneous neglect and termination proceedings pending in this state pertaining to J, one of Teagan's siblings, the petitioner contends that Connecticut has significant connection jurisdiction under the UCCJEA, § 46b-115k (a) (3) or (4). The respondent contends in response that Connecticut lacks significant connection jurisdiction because Teagan had not lived in, received services in, or even been to Connecticut, and that neither of her parents no longer intended to reside in Connecticut. I agree with the petitioner and conclude that Connecticut has significant

In re Teagan K.-O.

connection jurisdiction under either subdivision (3) or (4) of § 46b-115k.

Section 46b-115k (a) provides in relevant part: "[A] court of this state has jurisdiction to make an initial child custody determination if:

"(1) This state is the home state of the child on the date of the commencement of the child custody proceeding;

"(2) This state was the home state of the child within six months of the commencement of the child custody proceeding, the child is absent from the state, and a parent or a person acting as a parent continues to reside in this state;

"(3) A court of another state does not have jurisdiction under subdivisions (1) or (2) of this subsection, the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships;

"(4) A court of another state which is the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under a provision substantially similar to section 46b-115q [inconvenient forum] or section 46b-115r [unjustifiable conduct],[16] the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence, and there is substantial evidence available in this state con-

---

[16] The decisions of both the Florida court and the Connecticut trial court imply that the respondents engaged in unjustifiable conduct by leaving Connecticut for the purpose of avoiding the department's involvement with Teagan. It does not appear, however, that General Statutes § 46b-115r applies to the present case because that statute applies when the person engaging in such misconduct seeks to "invoke [the court's] jurisdiction . . . ." General Statutes § 46b-115r (a). By fleeing Connecticut, the respondents clearly were not trying to *invoke* the jurisdiction of any court.

In re Teagan K.-O.

cerning the child's care, protection, training and personal relationships;

"(5) All courts having jurisdiction under subdivisions (1) to (4), inclusive, of this subsection have declined jurisdiction on the ground that a court of this state is the more appropriate forum to determine custody under a provision substantially similar to section 46b-115q or section 46b-115r; or

"(6) No court of any other state would have jurisdiction under subdivisions (1) to (5), inclusive, of this subsection." (Footnote added.)

I begin by observing that determining which, if any, of these UCCJEA provisions applies is somewhat complicated by the Florida trial court's decision. The court's memorandum of decision does not (1) refer expressly to the UCCJEA by name or statutory provision,[17] (2) utilize any of the UCCJEA's jurisdictional labels commonly relied on by courts, (3) make factual findings that are necessary to support certain jurisdictional grounds under the UCCJEA, or (4) discuss certain considerations relevant to the UCCJEA's inconvenient forum analysis.[18] Indeed, the record of the Florida trial court

[17] The counterpart to § 46b-115k in Florida's UCCJEA is structured differently than the Connecticut statute, but it is the same substantively in all material respects. See Fla. Stat. Ann. § 61.514 (West 2012).

[18] For example, there is no written indication that the Florida court considered the distance between Florida and Connecticut or the parties' relative financial circumstances. Cf. General Statutes § 46b-115q (b) (3) and (4). Although the respondents did not make a specific argument regarding these factors, the father submitted into evidence a paystub reflecting an hourly wage of $9.50, which of course pales in comparison to the resources of a state child protection agency. Although the transcript of the Florida trial court hearing mentions items such as the fact that the respondents had signed an apartment lease, the father had obtained employment at a hotel, and the mother had commenced individual counseling sessions in Florida, the respondents did not raise any specific hardship arguments before the Florida court, ultimately leaving it to their counsel in Connecticut to raise these legitimate concerns with respect to the effect of Connecticut's exercise of jurisdiction on visitation and the provision of services to reunify the family.

proceedings before the "general magistrate"[19] demonstrates some apparent confusion about whether Florida's courts had exercised home state or temporary emergency jurisdiction over Teagan.[20] The general magistrate's oral decision, which acknowledges the father's hotel employment and the respondents' apartment lease, appears to assume that Florida is Teagan's home state but considered the family history and then pending proceedings in Connecticut regarding J. The general magistrate cited rule 8.205 (c) of the Florida Rules of

[19] A "general magistrate" is a quasi-judicial officer who conducts proceedings in a variety of matters under the supervision of a Florida state trial judge. See Fla. Fam. L. R. Proc. 12.490 (governing appointment of general magistrates by judges of state circuit courts and magistrates' responsibilities); R. Prugh, "Title Procedure Before General Magistrates and Child Support Enforcement Hearing Officers," 81 Fla. B.J. 77, 77–78 (2007).

[20] For example, at one point, the court and both of the parties to the Florida proceedings, specifically the father and the Florida child welfare agency, appeared to agree that the Florida court was exercising only temporary emergency jurisdiction over the custody matter, which is an exception to the original jurisdiction dictates of the UCCJEA. See footnote 10 of this opinion. This basis was reflected in the UCCJEA analysis in the Florida child welfare agency's appellate brief filed in that state's intermediate appellate court. Ultimately, the Florida agency contended in that brief that the trial court's transfer decision was proper because Connecticut has either significant connection jurisdiction or exclusive continuing jurisdiction, the latter based on the case then pending regarding Teagan's sibling, J, and our trial court's representation to the Florida court that Teagan's case would be consolidated with that pending matter.

On the other hand, the father also appeared to contend, on the basis of his employment and apartment lease, that Florida is the family's domicile and therefore should be deemed Teagan's home state. The Florida child welfare agency took the position in its appellate brief that Florida lacked home state jurisdiction because of evidence, namely, a phone call placed to the Florida department by one of their relatives, that the respondents planned to leave Florida as soon as Teagan was released from the hospital to avoid that agency's intervention as establishing that they did not intend to remain in Florida (i.e., that Teagan would never have "lived from birth" with her parents in Florida). Although the father criticized the general magistrate's decisions for failing to make certain findings of fact under the UCCJEA, the Florida child welfare agency contended in its appellate brief that he had failed to preserve that claim or take advantage of procedures available to challenge the magistrate's decision prior to its approval by a state trial judge. Ultimately, the Florida intermediate appellate court upheld the decision of the trial court without issuing an opinion that would have provided additional guidance.

In re Teagan K.-O.

Juvenile Procedure, which is a court rule governing the transfer of juvenile cases to other jurisdictions,[21] and stated: "I still am going to find . . . that Connecticut is a more convenient foreign state, and it's in the best interest and will promote the efficient administration of justice to transfer jurisdiction to Connecticut." The general magistrate's decision to transfer the case to Connecticut subsequently was upheld on review by a Florida trial judge and later was affirmed in a one line, per curiam decision by an intermediate appellate court.

As a matter of comity with Florida's state courts—particularly given that the general magistrate's initial decision received two additional layers of judicial review—I assume that the Florida courts acted properly as a matter of Florida law to deem Connecticut a more appropriate forum for this case and to transfer jurisdiction from that state. Nevertheless, whether our trial court properly *accepted* jurisdiction over this case under the UCCJEA, as enacted in Connecticut, remains a separate question of law subject to independent consideration and review by the courts of this state. See *Brown* v. *Brown*, 195 Conn. 98, 114, 486 A.2d 1116 (1985) (The court applied the predecessor act and concluded that "[t]he relinquishing by the Florida courts of their jurisdiction over this matter to Connecticut on the ground that Florida was an inconvenient forum clearly

---

[21] Rule 8.205 (c) of the Florida Rules of Juvenile Procedure provides: "Transfer of Cases Among States. If it should appear at any time that an action is pending in another state, the court may transfer jurisdiction over the action to a more convenient forum state, may stay the proceedings, or may dismiss the action."

I note that Florida's juvenile rules expressly contemplate and require compliance with the UCCJEA. See Fla. R. Juv. Proc. 8.203 ("Any pleading filed commencing proceedings as set forth in rule 8.201 shall be accompanied by an affidavit, to the extent of affiant's personal knowledge, under the Uniform Child Custody Jurisdiction and Enforcement Act. Each party has a continuing duty to inform the court of any custody proceeding in this or any other state of which information is obtained during the proceeding."); see also *D.M.* v. *J.D.M. ex rel. C.F.*, 814 So. 2d 1112, 1116 (Fla. App. 2002) (citing rule 8.203 requiring compliance with predecessor act).

In re Teagan K.-O.

does not bind the courts of Connecticut to assume jurisdiction. It is for the courts of this state, and no other, to decide in proceedings brought here whether Connecticut constitutes a more appropriate or inconvenient forum for a custody determination.'').

This deference to Florida is supported by the fact that it does not matter to my significant connection analysis whether the Florida court acted only on a temporary emergency basis, with no other court having home state jurisdiction; see General Statutes § 46b-115k (a) (3); or whether Florida had home state jurisdiction that it declined to exercise on the ground that Connecticut was a more appropriate and convenient forum.[22] See General Statutes § 46b-115k (a) (4). Under either basis, my independent analysis requires me to consider whether (1) ''the child and at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence,'' *and* (2) ''there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships . . . .'' General Statutes § 46b-115k (a) (3) and (4). ''Both mechanisms for establishing jurisdiction outside of the child's home state exemplify the overarching mission of the UCCJEA to prevent ongoing harm to neglected children, by providing highly elas-

[22] For purposes of my analysis, and giving the respondent every jurisdictional benefit of the doubt, I deem it particularly appropriate to assume, consistent with the UCCJEA's prioritization of home state jurisdiction, that Florida was in fact Teagan's home state. I note, however, that, contrary to the petitioner's argument in her initial brief, the fact that Florida is deemed Teagan's home state does not permit it to bestow jurisdiction on Connecticut pursuant to § 46b-115k (a) (5) solely on the basis of its more convenient forum finding. This argument is inconsistent with the plain language of § 46b-115k (a) (5), which requires ''all'' courts having significant connection jurisdiction to similarly decline jurisdiction along with those having home state jurisdiction. On the facts of this case, with only two states involved and Connecticut having that significant connection, all UCCJEA roads lead back to Connecticut in any event. Accordingly, I similarly need not address the petitioner's second jurisdictional argument under the UCCJEA, namely, that Connecticut could exercise default jurisdiction under § 46b-115k (a) (6).

In re Teagan K.-O.

tic means for avoiding jurisdictional conflict.'' *In re J.R.*, 33 A.3d 397, 401 (D.C. 2011).

Having reviewed the record in this case, I conclude, on the basis of undisputed facts, that Connecticut has substantial connection jurisdiction. It is beyond cavil that, in this case of predictive neglect, the second element, namely, that ''there is substantial evidence available in this state concerning the child's care, protection, training and personal relationships,'' is satisfied. General Statutes § 46b-115k (a) (4). The respondents lived in Connecticut their entire lives, they have extended family here, the conduct giving rise to the allegations of Teagan's predictive neglect occurred here, and the respondents have had extensive involvement with our courts, the department, and Connecticut service providers. See, e.g., *In re J.R.*, supra, 33 A.3d 401 (citing similar lengthy history); *In re M.S.*, 205 Vt. 429, 440–41, 176 A.3d 1124 (2017) (same); see also footnote 2 of this opinion.

Returning to the first element, namely, whether ''the child *and* at least one parent or person acting as a parent have a significant connection with this state other than mere physical presence,'' there is similarly little dispute that the respondents have a significant connection with Connecticut. (Emphasis added.) General Statutes § 46b-115k (a) (3). The more difficult question is whether Teagan herself has a significant connection with this state. As the petitioner argues, the strength of a child's personal connection with a state will be more tenuous, by definition, when the child is a newborn. See *In re D.T.*, 170 Vt. 148, 153, 743 A.2d 1077 (1999) (''It is difficult to conceive that a [ten week] old child can have 'significant connections' to a state. A court has to evaluate the situation presented, however, and in the case of a [ten week] old infant, a court could find that, in unique circumstances, the requisite connection to a state has been met.''). The significance of a newborn's connections with a state is determined by

In re Teagan K.-O.

considering the strength of her parents' present and future connections, conduct, and relationships with respect to that state. See, e.g., *H.T.* v. *Dept. of Human Resources*, 163 So. 3d 1054, 1066 (Ala. App. 2014) ("The child was only [a] few days old at the commencement of the dependency proceedings, and an assessment of significant past connections the child had to Alabama cannot be made. However, the evidence establishes that the mother had past, present, and future connections in Alabama and that the child had present and future connections with this state.").

My survey of cases from other jurisdictions in which significant connection jurisdiction was considered in neglect and dependency cases reveals that proof of the following factors will support a conclusion that an infant has a significant connection to a forum state as a result of parental conduct: (1) history of long-term residency in that state by a parent; (2) the ongoing presence of the child's siblings in the state, especially if they are in the state's legal custody; (3) the presence of other relatives in the state; or (4) a state's provision of child welfare or other social services to the family.[23] See id., 1066–67 (relying on mother's frequent moves between Alabama and Georgia, and her receipt of social services from Alabama, to establish significant connection between Alabama and newborn born in Georgia); *In re J.R.*, supra, 33 A.3d 401 (considering family's history of involvement with District of Columbia child welfare system, including fact that mother herself had been juvenile ward of District, in determining that Dis-

---

[23] I do not consider the cases examining substantial connection in the context of custody disputes between parents to provide significant guidance in the child neglect context. In those cases, a substantial connection exists when one parent resides in the state and exercises parenting time in that state; see, e.g., *White* v. *Harrison-White*, 280 Mich. App. 383, 392–94, 760 N.W.2d 691 (2008) (citing this standard after comprehensive review of case law from other jurisdictions); or when an older child maintains a relationship with relatives or friends in the state. See, e.g., *Rennie* v. *Rosenthol*, 995 A.2d 1217, 1222 n.6 (Pa. Super. 2010) (citing cases applying this factor).

trict had significant connection to infant whose home
state was Maryland); *In re D.S.*, 217 Ill. 2d 306, 319–20,
840 N.E.2d 1216 (2005) (holding that significant connec-
tion existed when six of infant's half siblings were Illi-
nois residents who were subject of termination pro-
ceedings pending in Illinois); *In re J.S.*, supra, 131
N.E.3d 1271–72 (concluding that mother and infant had
significant connection with Illinois when mother "ha[d]
three other children [there who were no longer] in her
care after findings of abuse and neglect," two of whom
were currently under care of state agency, and "[t]he
trial judge who ruled on the state's petition in [the
infant's] case [was] the same judge presiding over the
cases" of two children in state custody); *In re Arnold*,
532 S.W.3d 712, 718 (Mo. App. 2017) (concluding that
parents and infant had significant connections to Mis-
souri when infant's siblings had been under state court
jurisdiction for several years and were then in legal
custody of state child welfare agency, and parents' crim-
inal cases involving alleged abuse of one of child's sib-
lings were pending in Missouri.); *In re M.S.*, supra,
205 Vt. 440–41 (concluding that significant connection
existed when infant's "older brother was in the custody
of [Vermont child protection agency] following serious
unexplained physical injuries, and there were ongoing
[court] proceedings . . . concerning that child's wel-
fare"); see also C. Catalano, Annot., Construction and
Application of Uniform Child Custody Jurisdiction and
Enforcement Act's Significant Connection Jurisdiction
Provision, 52 A.L.R.6th 433, 453, § 2 (2010) (citing
cases).

Guided by these cases, I conclude that the fact that
two of Teagan's siblings live in this state, with one, J,
in the custody of the Connecticut department pending
the termination of the respondents' parental rights to
him, in connection with the respondents' lengthy his-
tory of receiving services from the department and
residing here, is a sufficient basis to establish a signifi-

In re Teagan K.-O.

cant connection between Teagan and this state. This is particularly so because no significant time had passed from their move from Connecticut to Florida that would have functioned to attenuate those connections to Connecticut while establishing Florida as their new home state.[24] Accordingly, I conclude that Connecticut's Superior Court has jurisdiction over the neglect petition under § 46b-115k (a) (3) or (4).[25]

Because I would affirm the decision of the trial court, I respectfully dissent in part.

––––––––––––––––

[24] I need not consider whether it matters to the significant connection analysis that the respondents' parental rights to J had not yet been terminated at the time that the petitioner filed Teagan's neglect petition in the trial court for purposes of considering any relationships between the respondents, J, and Teagan. See, e.g., *Khawam* v. *Wolfe*, 84 A.3d 558, 563 (D.C. 2014) ("[i]n determining whether these [UCCJEA] requirements are met, the trial court considers the situation at the time the initial custody application is filed"); *Tomlinson* v. *Weatherford*, 399 P.3d 961, 965 (N.M. App. 2017) ("[t]he facts relevant to jurisdiction under the [UCCJEA] are those that existed at the time the petition was filed"); see also *In re Aiden L.*, 16 Cal. App. 5th 508, 516, 224 Cal. Rptr. 3d 400 (2017) (applying this principle); *Dept. of Human Services* v. *T.F.*, 292 Or. App. 356, 359, 425 P.3d 480 (2018) (same).

[25] In light of my basis for this conclusion, I need not address the respondent's arguments challenging the Connecticut trial court's decision, insofar as that court stated that, because the respondents had moved to Florida to avoid involvement with the Connecticut department, they were not entitled to "equitable redress." The conferral of statutory jurisdiction eliminates equitable considerations. I similarly leave to another day the respondent's novel claim that this equitable determination equated to imposing a duty on the respondents to remain in Connecticut, which, in turn, violated their constitutional right to interstate travel.